**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

PATRICK JOSEPH CHAREST,        :
AIS 182262,

                                     :

       Petitioner,

                                     :

vs.                           CA 10-0067-CG-C

                                     :

BILLY MITCHEM,

                                     :

       Respondent.

**REPORT AND RECOMMENDATION**

This cause is back before the undersigned for issuance of another report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), following remand of this action by the Eleventh Circuit Court of Appeals (*see* Doc. 29). The appellate court's April 14, 2011 unpublished opinion vacating the judgment of this Court and remanding for further proceedings (*id*.) was issued as mandate on June 24, 2011 (Doc. 31) and reads, in relevant part, as follows:

> We prefer for the district court to address in the first instance the significance for this case of the Supreme Court's decision in Magwood [v. Patterson,   , U.S.   , 130 S.Ct. 2788 (2010)]. On remand, the district court should address, inter alia, the following issues: (1) whether the August 12, 2005, Order of the Circuit Court of Baldwin County, Alabama, constitutes a "new judgment" as contemplated by the Supreme Court in Magwood; (2) if so, whether Charest is entitled to assert in the instant habeas not only challenges to his sentence[s], but also challenges to his underlying conviction[s]; and (3) if there is no bar to Charest's challenge to his underlying conviction[s] pursuant to 28 U.S.C. § 2244(b), is there nevertheless a bar pursuant to the abuse of the writ doctrine.[1] The second issue was expressly not addressed by the Supreme Court in Magwood. See id. at 2802-03. But see Johnson v. United States, 623 F.3d 41 (2d Cir.

---

[1]       "On remand, the district court should also address any relevant time bars or procedural bars." (Doc. 29, at 7 n.3.)

2010). Also, the third issue was apparently also left open by <u>Magwood</u>.
See <u>Magwood</u>, 130 S.Ct. at 2803 (Breyer, J., concurring).

(Doc. 29, at 6-7.) While the undersigned initially read the Eleventh Circuit's opinion as requiring the respondent to amend his answer to raise any additional defenses available to him, such as procedural default (*see* Doc. 39), the respondent later argued that this Court first need address the foregoing issues raised by the Eleventh Circuit's remand opinion before requiring, if necessary, the respondent to file an amended answer (*compare* Doc. 46 *with* Docs. 47-49). Because briefing on the three issues identified by the Eleventh Circuit is now complete (see Docs. 50, 57 & 59), and the respondent has expanded the record in this case as ordered by the undersigned (*compare* Doc. 58 *with* Doc. 62), this cause is ripe for entry of the instant report and recommendation.[2]

In order for the undersigned to properly address the issues framed by the Eleventh Circuit, it is necessary to provide a proper historical context to petitioner's convictions and sentences and, to this end, the undersigned ordered from the Federal Records Centers of the National Archives and Records Administration the complete file of petitioner's habeas corpus attack on his convictions and sentences filed on May 8, 2003, *Charest v. Ferrell*, 03-0283-CB-L, Doc. 1.[3] Therefore, while some of the facts utilized herein will be the same as those contained in the undersigned's report and recommendation entered in this case on June 1, 2010 (Doc. 10), the undersigned will

---

[2]     The undersigned notes that he prominently will address whether Charest's petition is time barred given that this issue has also been fully briefed by the parties. (*Compare* Doc. 50, at 8 and Doc. 59, at 10-11 (pertinent pages of petitioner's briefs) *with* Doc. 57, at 28-32 (pertinent pages of respondent's brief).)

[3]     The habeas petition filed by Charest in 2003 was not the first habeas corpus complaint filed by petitioner in this Court. Indeed, on June 23, 1997, Charest filed his first federal habeas corpus petition in this Court. *See Charest v. Johnson*, CA 97-0565-CB-M, Doc. 1. This petition was dismissed on October 14, 1997 due to Charest's failure to prosecute. *See id.* at Doc. 8.

also liberally intersperse facts gleaned from *Charest v. Ferrell, supra,* the supplemental documents filed by the respondent (*see* Doc. 62), and facts not included in the previous report and recommendation though available to the undersigned at that time from the documents filed by the respondent and appended to his answer (*see* Doc. 9, Exhibits A-H).

## BACKGROUND

On March 14, 1995, Charest was convicted of first-degree rape and first-degree sodomy in the Circuit Court of Baldwin County, Alabama. (*See* Doc. 9, Exhibit F, at 1.)[4]

> On May 27, 1994, petitioner planned to pick up his teenage daughter, Tina, and her sixteen year old friend, a minor female (hereinafter referred to as "A.C.") along with Tina's younger sisters, Tiffany and Terri, from University Mall in Pensacola. Because petitioner was late, Tina contacted her mother who then drove to the mall to pick up the children. (Doc. 11, Exhibit AA, Vol. I, R-64-R-66; Vol. II, R-245-R-246). Upon the mother's arrival, petitioner also arrived, and it was apparent that he had been drinking. (Id.). Tina's mother drove Tiffany and Terri home, while Tina and "A.C." accompanied petitioner in his truck. (Id. at R-64-R-66). After leaving the mall, petitioner drove to a convenience store where he purchased wine coolers, and then commented that he did not want to go home because his wife, Tina's mother, was angry with him. (Id. at R-68; Vol. II, R-247). Tina asked to drink a wine cooler, and petitioner agreed but advised her to not drink it in public because she might get in trouble. (Id. at R-94, R-105). Tina then suggested that they drive to Barrineau Park where there was a party going on.[5] (Id. at R-103-R-105).

> When petitioner, Tina, and "A.C." arrived at Barrineau Park, they drove across the bridge into Alabama, parked, and drank the wine coolers

---

[4]   Petitioner was also convicted of misdemeanor contributing to the delinquency of a minor, for which he received a sentence of one year in the Baldwin County Jail to be served consecutively to his life sentences. *Charest v. Ferrell,* CA 03-0283-CB-L, Doc. 11, May 26, 1995 Sentencing Transcript, at 9.

[5]   "Barrineau State Park is located at the Perdido River, where the bridge connects the Florida and Alabama state lines. (Doc. 11, Exhibit AA, Vol. I, R-53-R-55). Throughout the evening and early morning of May 28, 1994, petitioner, Tina, and 'A.C.' traveled back and forth between the Florida side and the Alabama side. The alleged crimes occurred while petitioner and 'A.C.' were located on the Alabama side of the bridge. (Id. at R-69-R-70, R-76-R-77; Vol. II, R-253-254, R-270)." (Doc. 9, Exhibit B, at 2 n.2.)

petitioner had previously purchased. (Id. at R-69-R-71; Vol. II, R-249). Later, the three left the Park area and drove to a convenience store because they were out of alcohol. (Id. at R-71-R-72; Vol. II, R-250). After buying additional wine coolers, petitioner and the girls returned to the Park area and parked on the Florida side. (Id. at R-74-R-75). Petitioner's nephew, Ruben O'Donovan, joined petitioner and "A.C." at petitioner's truck, while Tina accompanied her cousin Crystal O'Donovan to a nearby bonfire party. (Id.) "A.C." testified that petitioner helped her to stand by the truck because she was drinking and having trouble standing. (Id. at Vol. II, R-252-R-253). Petitioner kissed "A.C.", and then told Tina that he was going to go "help" "A.C." "throw up." Petitioner subsequently drove "A.C." alone to the Alabama side of the bridge. (Id. at Vol. II, R-177, R-253; Vol. III, R-360).

Once on the Alabama side of the river, "A.C." testified that petitioner helped her take off her clothes. (Id. at Vol. II, R-253-R-254, R-260-R-261). According to "A.C.", petitioner then tried to have intercourse with her, but told her that she was too "little." (Id. at Vol. II, R-261). "A.C." felt that petitioner's penis did penetrate her at least in part, and it was painful. (Id. at Vol. II, R-263). "A.C." stated that she was crying and telling petitioner to stop, but she was weak from the alcohol. (Id. at Vol. II, R-261). Petitioner then pushed "A.C."'s head down, and instructed her to "suck" his "cock." (Id. at Vol. II, R-261-R-262). "A.C." testified that she tried to fight, but she was weak and ultimately threw up on petitioner as he was forcing her mouth onto his penis. (Id. at Vol. II, R-262). The incident ended when Tina approached petitioner's truck. (Id. at Vol. II, R-264).

Crystal likewise testified that she and Tina had watched the truck cross the bridge and disappear onto the Alabama side of the river. (Id. at R-77; Vol. II, R-177-R-178). Tina became worried, and she and Crystal walked across the bridge to find her father and "A.C.". (Id.) Crystal testified that on their first trip over the bridge, they could not find petitioner's truck, and thus returned to the Florida side of the river so they could use the bathroom. (Id. at Vol. II, R-179, R-181-R-182). Crystal testified that after returning to the Florida side of the river, she and Tina used the bathroom, and then walked a second time over the bridge, and located petitioner's truck on the Alabama side of the river. (Id. at Vol. II, R-179-R-182). According to Crystal, she and Tina approached the truck which was parked with the doors closed and tinted windows rolled up, and they knocked on the driver's side door. (Id. at R-79-R-80; Vol. II, R-182). Crystal testified that petitioner cracked his window, advised them that "A.C." was throwing up in his truck, and requested that Crystal and Tina walk back over the bridge and obtain a towel to clean up the mess. (Id. at Vol. II, R-183). After Crystal and Tina walked to the Florida side of the bridge, petitioner followed them a few minutes later. (Id.) After they obtained a towel, Crystal stayed on the Florida side of the river while

4

petitioner and Tina returned to the Alabama side of the river where "A.C." had remained. (<u>Id</u>. at Vol. II, R-188). Crystal testified that when petitioner, "A.C." and Tina returned to the Florida side of the river, they stopped and socialized for a little while prior to leaving for home. (<u>Id</u>. at Vol. II, R-189-R-190).

> After petitioner, Tina, and "A.C." left Barrineau Park, they returned to petitioner's home in the early morning hours of May 28, 1994. (<u>Id</u>. at Vol. II, R-266). Tina and "A.C." changed into pajamas and went into the bathroom, where Tina's mother approached and inquired as to whether they had been drinking. (<u>Id</u>. at Vol. II, R-266-R-267). Tina denied that they had been drinking, and the two girls then went to bed. (<u>Id</u>.) The next morning, according to "A.C.", she called her mother numerous times requesting that she come and pick her up because she was not feeling well. (<u>Id</u>.) "A.C."'s mother finally did arrive to pick her up around 8 or 9 a.m. (<u>Id</u>. at Vol. II, R-267). Before she left, "A.C." said that petitioner approached her and questioned her as to whether something had happened between them the night before, or whether it was a "dream." (<u>Id</u>.) Petitioner instructed "A.C." that she should tell no one about the incident. (<u>Id</u>. at Vol. II, R-267-R-268). "A.C." testified that she did not tell Tina about the incident because Tina was her best friend and "A.C." did not want to hurt her. (<u>Id</u>. at Vol. II, R-266). Approximately three weeks later, "A.C."'s older sister suspected what had occurred, and thus advised their mother, Debra Cushing. (<u>Id</u>. at Vol. II, R-277).

(Doc. 9, Exhibit B, at 2-5 (internal footnote omitted).)[6] Charest was sentenced, on May 26, 1995, to consecutive terms of life imprisonment for rape and sodomy. (Doc. 9, Exhibit  F, at 1.)[7] Petitioner's convictions and sentences were affirmed on appeal by the Alabama Court of Criminal Appeals in an unpublished memorandum decision issued on December 1, 1995. *See Charest v. State*, 682 So.2d 528 (Ala.Crim.App. 1995) (table).

## I

Charest contends that the trial court erroneously ruled that he

---

[6]     The undersigned would now add to this recitation of the testimony at petitioner's trial that Crystal O'Donovan testified that from the moment petitioner and A.C. left the Florida side of the river in his truck and travelled to the Alabama side of the river, fifteen (15) to twenty (20) minutes passed before she and Tina Charest knocked on the driver's side window of the truck. *See Charest v. Ferrell*, CA 03-0283-CB-L, Doc. 11, Exhibit AA, T.T. 185.

[7]     As previously noted, Charest also received a one-year consecutive sentence based upon his conviction for contributing to the delinquency of a minor. *See, supra*, n.4.

failed to present a prima facie case that the prosecution had violated the rule in Batson. Charest alleged that the prosecution struck jurors on the basis of their gender. At trial, Charest made his Batson motion, and supported it only with the allegation that "the state has predominately struck male members of the jury. The state as well as the defendant had nine strikes in this case. Five of the state's strikes were male members of the jury." Charest further notes, in the record, that there were more men than women on both the jury venire and the petit jury.

As in Baker v. State, [CR-94-0061, released September 29, 1995] So.2d ___ (Ala.Cr.App. 1995), "the record does not contain the clerk's office jury list of any relevant information about the jurors." The record does not reflect the composition of the jury venire or of the petit jury. Therefore, Charest has provided the court with insufficient data to support a statistical analysis of the prosecution's strike pattern. We further note that based upon Charest's cursory colloquy with the trial court, the trial court was well within its discretion in ruling that Charest failed to present a prima facie case of a Batson violation. This issue is without merit.

II.

Charest contends that the trial court erroneously denied his requested jury charge on circumstantial evidence. Following the jury charge, Charest made the following objection: "We object to the Court's refusal to charge on circumstantial evidence." This general objection stated no grounds, and was insufficient to preserve this question for appellate review.

III.

Charest contends that his consecutive life sentences violated the constitutional bar against double jeopardy. Specifically, Charest argues that rape and sodomy are "kindred crimes" for which double punishment [is] disallowed. The law is settled that rape and sodomy are very different crimes, and the double jeopardy bar does not prohibit punishment for each offense separately. This contention is without merit.

*Charest v. Ferrell,* 03-0283-CB-L, Doc. 5, Exhibit A, R. 228-229 (most internal citations omitted). A certificate of final judgment of affirmance was issued by the Alabama Court of Criminal Appeals on February 6, 1996. (Doc. 9, Exhibit G, at 1.)

Charest filed his first Rule 32 petition in the Circuit Court of Baldwin County, Alabama some two years later on February 10, 1998, collaterally attacking his

convictions and sentences. (*Id.*) Charest attached to his approximately eighty-seven (87) page *pro se* collateral attack numerous exhibits, including a letter dated August 8, 1995 and addressed to one Daniel Craven, Esquire, a motion for production of documents, and a January 22, 1998 memorandum penned by Thayer C. Lindauer to Harold Pridgeon with attached statutory law. *See Charest v. Ferrell*, 03-0283-CB-L, Doc. 5, Exhibit A, R. 111-124, 131-135 & 196-200. In the letter to Craven, Charest complained that his charges "stem[med] from Florida not Alabama" and, further, that trial counsel provided ineffective assistance in failing to file a motion "to quash case prior to trial for . . . wrongful state prosecuting [his] charges, since State of Florida could not find any evidence, [then] Alabama does[.]" *Id.* at R. 113 & 114. Moreover, his motion for production of documents sought copies of all "reports, conclusions, findings, writings, statements, documents, or any evidence from the Florida officials who[] initially investigated []his [] case[.]" *Id.* at 133. Finally, but by no means any less important, Lindauer's letter to Pridgeon reads, in relevant part, as follows:

> I went to the local law library and got copies of portions of each state's constitution. Attached is Article 2 of the Alabama Constitution wherein Section 37 defines the boundaries Alabama has with Florida. Next you will see Sections 6.08 and 6.081, these are provisions in the Florida Constitution that define Florida's boundary with Alabama.

> You need to take these to a qualified surveyor. I am not a surveyor, but I read the Alabama statute and Section 6.081 of Florida's law to be consistent and probably mean that the state boundary along the Perdido River is the middle of the river. But I can't be sure and I want a surveyor to tell us, both from Alabama's law and again from Florida's law, where each state places the boundary in relation to the Perdido River.

> I could find no cases where the courts dealt with the problem of the river changing course over the years. Surely a competent local surveyor understands that concept and how it is dealt with for surveying purposes.

*Id.* at R. 196. Interestingly, four days prior to Charest's lengthy filing, petitioner's

7

retained Rule 32 counsel, William Scully, Esquire, filed a Rule 32 petition on Charest's

behalf raising numerous issues, including the following:

> C.   The Court was without jurisdiction to render judgment or to impose sentence in that the offense, if any, was committed in the State of Florida, not in the State of Alabama.

>> 1)   The incidents complained of in this case occurred on and near a bridge between the State of Alabama and the State of Florida. ***The petitioner has evidence that the location upon which the incident is alleged to have occurred is, in fact, located in the State of Florida.*** This would deprive the Court of jurisdiction over the subject matter of this case.

>> 2)   As noted above, this issue was not preserved at trial by the defendant's trial attorney, or raised on appeal by the defense appellate attorney.[8]

>> .     .     .

> E[.]   There are newly discovered material facts which exist that require the conviction or sentence to be vacated by the Court.

>> 1)   In particular, as noted above, ***the petitioner has evidence that the incident complained of occurred in the State of Florida, not in the State of Alabama.***

>> 2)   The defendant did not have adequate ability to discover this information at the time of trial, and has only recently discovered it.

>> 3)   This is a material fact, which if accurate, would require the conviction to be vacated as the Court would lack jurisdiction.

*Id.* at R.264 & 266 (emphasis supplied).

On May 28, 1998, Charest filed a *pro se* motion to compel the State's "belated

answer" to an order entered by the Baldwin County Circuit Court. *See* id. at R. 287-296.

Therein, Charest noted the need for the state to respond to his petition's numerous

---

[8]   Concurrently, therefore, Scully argued that petitioner's trial and appellate counsel provided ineffective assistance in failing to raise this jurisdictional issue. *Id.* at R. 261.

"meritorious" issues, including: "Whether <u>Vel Non</u> did Alabama/Florida have in '<u>Personam</u> <u>Jurisdiction</u>' to prosecute Charest[.]"  <u>Id</u>. at R. 292.  When the State finally filed its response to Charest's Rule 32 petition on June 25, 1998, the Assistant District Attorney argued that this issue was one "of fact[]" which should have been raised "at trial, at the end of the State's case, at the end of the evidence, or after pronouncement of sentence." <u>Id</u>. at R. 304. On the same day that the State filed its response, Charest filed a request that the court take judicial notice of certain facts. *Id.* at R. 311-315.

CHAREST RESPECTFULLY[] avers that this honorable court to fully accept this Exhibit marked herein as "[WW]", so by the 'Mobile Press Register', dated April 7, 1998 by staff reporter Mrs. Connie Baggett.

2.

CHAREST AVERS[] that this adjudicative fact, ***established by Greg Spies***, secretary of the Alabama Society of Professional Land Surveyors, respectfully shows:

1,      "'Dispute[] Revived'";
2,      "'No Quick Answers'";
3,      "'Marked by Mounds'";
4,      "A Large Task'";

Wherein ***Greg Spies says: "It[']s 1840 all over again."***

3.

CHAREST AVERS[] that through the 1790 calculations, they [were] in some points remarkably accurate, there [were] obvious errors, and its [q]uoted therein that the plotting came close, his line actually ran from a few feet to hundreds of feet [off], to the agreed-upon line.

4.

CHAREST AVERS[] further that "when Ellicott's mound lines, as in case sub judice, were retraced it was a straight line," Spies said: "From mound to mound it zig-zags, or the[re] is an angular change from mound to mound. It[']s about <u>One-Hundred (100) to Nine-Hundred (900) feet [Off]</u>, what we consider to be the . . . [Ala/Fla. Border], today."

5.

CHAREST AVERS[] that the United States Bureau of Land Management surveyor, Mr. Corwyn J. Rodine, says:

"Researchers would have to pore over Historical records and interview landowners to get evidence, and;

"Estimates of $600,000.00 to retrace the path are very conservative,[] he said."

6.

CHAREST AVERS[] that even President George Washington[] in 1796 duly appointed surveyor "Ellicott" to survey and mark boundary between the United States[] and the Florida boundary held by Spain[.] . . . [T]he Alabamian surveyor said:

"The <u>state boundary</u> marked on roadways <u>are not reliable survey[]s</u>, reference points. So <u>debates are likely to linger until the Federal government orders the line to be resurveyed</u>."

"Since the states, (Ala/Fla), would have to agree to abide by '<u>its results</u>', few would expect . . . resurvey anytime soon."

*Id.* at 311-313 & 313 (some emphasis added).

On July 6, 1998, Charest filed a *pro se* traverse to the Assistant District Attorney's answer and therein argued at some length that the exhibits he had supplied the court reflected that any alleged crime occurred in Florida, not Alabama. *See id*. at 336-338.

<u>[B]ecause of the inherent Constitutional violations</u>, the Constitution supersedes any procedural doctrine, any forfeiture default at the fault of [t]rial, sentencing and appellate counsel, when raised under Rule[] 32.

Take judicial notice of the argument and admissions herein by both parties especially the Respondent[']s "This is an issue of fact", that the alleged crime occurred not in Alabama as alleged, originally, but in fact in Florida as presented herein, so by the state admitting this issue, it[']s easy to concur the Convictions/Sentences are clearly illegal and not authorized by law. The Alabama Supreme Court held in <u>Ex parte Brannon</u>, 547 So.2d 68, 69 (Ala. 1989), when a sentence is clearly illegal or is clearly not authorized by statute, the defendant does not have to object at trial level in order to preserve that issue for appellate review. . . . Indeed the

10

illegality of a defendant's sentence is a ground specified in Rule 20 . . . for a collateral Post-Conviction remedy, as herein[] (now Rule 32).

It is well established law, that a right to [be] tried in place where offense occurred is substantially a Constitutional right. Proof of venue is jurisdictional to the extent that without such proof, where question is properly raised, conviction cannot stand.

The Petitioner would further argue that the state's line of reasoning: "The time for a defendant to raise this issue is at trial, at the end of the state['s] case, at the end of the evidence, or after pronouncement of sentence[,"] [d]oes not follow stare decisis.

The Petitioner would assert that this Honorable Court[] merely need not look any further[] to determine that the Petitioner's Convictions and Sentences are due to be held naught, set aside and appropriately vacated.

*Id*. at 337-338 (internal citations omitted).

On December 28, 1998, Susan G. James, Esquire, filed her notice of appearance as counsel of record for Charest. *See id*. at 350. James sought leave to supplement Charest's Rule 32 petition on March 11, 1999, specifically averring therein that new evidence had been discovered supporting the claim that petitioner had been deprived of his Sixth Amendment right to effective assistance of counsel. *See id*. This supplement did not "touch upon" or provide further development for Charest's contention that the alleged crimes did not occur in Alabama. *See id*. at 353-364.[9] However, counsel for Charest filed a consolidated petition for relief from conviction or sentence pursuant to Rule 32 on April 19, 1999, *see id.* at 379-400,[10] and therein noted that petitioner was "anxious that

---

[9]      On March 26, 1999, James filed a motion to add petitioner as co-counsel based upon Charest's desire to participate "in presenting evidence[.]" *Id*. at 367-368.

[10]      As noted in the report and recommendation entered by this Court on January 31, 2005, "[o]n March 19, 1999, the circuit court held a hearing, and, on April 2, 1999, it entered an order on the case action summary, ordering new counsel to file an amended petition within 30 days. . . . The court also entered an order striking all pleadings filed before March 19, 1999." *Charest v. Ferrell,* CA 03-0283-CB-L, Doc. 14, at 7 (citations omitted).

each and every issue raised in the original, amended, and supplemental petitions become a part of this final consolidated petition[,]" *Charest v. Ferrell*, 03-0283-CB-L, Doc. 5, Exhibit A, R. 394, and thereafter listed additional grounds for relief including the following:

> c.    The Defendant was denied effective assistance of counsel at the trial and appellate levels in the following ways:
>
> > 1.    The Defendant's attorney at trial failed to adequately object to and preserve[] jurisdictional issues. The Court was without jurisdiction to render judgment or to impose sentence in that the offense, if any, was committed in the State of Florida, not in the State of Alabama. The incidents complained of in this case occurred on or near a bridge spanning the Perdido River. The State however, never offered strict proof of jurisdiction. ***At that point along the river, the Perdido River is not the border between Alabama and Florida and Barrineau Park may be at least twenty miles from the Alabama border (Affidavit Exhibit D)*.**[11]
> >
> > 2.    The Defendant's appellate counsel failed to consult with the Defendant when preparing Petitioner's appeal.

*Id*. at 395 (emphasis supplied). The State's June 22, 1999 response to petitioner's jurisdictional issue raised in his consolidated Rule 32 petition reads, as follows: "All the witnesses testified that the events occurred in Alabama. The Alabama Code and applicable Florida statutes show the border between the States at the location where Charest raped and sodomized the child is the middle of the Perdido River." *Id*. at 489-490.[12]

On July 8, 1999, a hearing was conducted by the Circuit Court of Baldwin

---

[11]    *"Affidavit forthcoming[.]" Id*. at 395, n.4 (emphasis supplied).

[12]    Interestingly, the Rule 32 record contains an offense report prepared by the Escambia County (Florida) Sheriff's Department and the following observation by the officer receiving the information from the victim's mother: "FROM THE INFORMATION I OBTAINED IT SOUNDS AS THOUGH THE ACTUAL OFFENSE TOOK PLACE ON THE ALABAMA SIDE OF THE RIVER." *Id*. at R. 428.

County, Alabama "on the petition for Rule 32 relief." *Charest v. Ferrell*, 03-0283-CB-L, Doc. 5, Exhibit A, Vol. IV, Rule 32 Transcript at 32; *see also id.* Tr. 33-107. Although the focus of that hearing was on other issues, *see id.*, including specific instances of ineffective assistance of counsel, Charest was afforded the opportunity to list all instances of ineffective assistance of counsel that deserved attention from the court, *see id.* at 73-74, and specifically mentioned his trial attorney's failure "to challenge the jurisdiction or the venue of this specific case, because it was dealing allegedly on the border of Florida and Alabama, and all the witnesses and testimony came out of the State of Florida." *Id.* at 74; *see also id.* ("And I would assume that Mr. Matheny will even allege that every official that ever had to go investigate . . . includ[ing] him . . . all went to Florida to investigate this crime.").  In the March 10, 2000 order denying Charest Rule 32 relief, Baldwin County Circuit Judge Lyn Stuart specifically noted in answer to Charest's assertion that "there was lack of jurisdiction and [] his counsel failed to properly raise the issue[]" that "[t]here was ample evidence that the offenses occurred in the State of Alabama." *Charest v. Ferrell,* 03-0283-CB-L, Exhibit A, R. 504 & 505.

On March 22, 2000, Charest filed a motion for reconsideration in which he argued that the trial court "ONLY TOUCHED" upon his claim that "Alabama had no[] jurisdiction over (subject matter) of the alleged offense and prosecuted [him] illegally[,]" *id.* at 508, and argued that the trial court gave no consideration to his argument that ***"[c]ounsel failed to object to Sgt. Griffith['s] testimony (Perdido River) establishing jurisdiction[.]"*** *Id.* at 510 (emphasis supplied). In his "Exhibit" filed in support of the motion for reconsideration, Charest made the following arguments:

ISSUE # 6-
ALABAMA HAD NO JURISDICTION AND PROSECUTED ILLEGALLY

The State never offered strict proof of jurisdiction[.] A mere allegation that the alleged offense occurred on the "Alabama-side" of the Perdido River is not sufficient proof. The Perdido River is not the border between Alabama/Florida at that point, and in actuality, the site where the alleged offense[s] occurred[] may be at least [t]wenty (20) miles in Florida, establishing the boundary.

.    .    .

ISSUE # 14-
COUNSEL'S PERFORMANCE AT TRIAL WAS INADEQUATE &
INEFFECTIVE PER STRICKLAND

JAMES MAY AT TRIAL

.    .    .

4[.]    Failed to File Motion for challenge the Jurisdiction/Venue[.]

.    .    .

11[.]   Failed to speak with the Florida [a]ttorney, Katherine Eddings[,] whom already represented Charest in present case, prior to it coming to Alabama[.]

.    .    .

ISSUE # 15-
COUNTS I, II & IV WERE ILLEGALLY CONSOLIDATED

.    .    .

(3)     Count III[] is an offense which claims "contributing" occurred in Alabama, but no proof whatsoever was presented in this offense, that it, in fact[,] occurred in Alabama (Fatal Variance), and such offense, which occurred, if at all, wholly in the State of Florida and cannot now be included in any Alabama Indictment; the court has no jurisdiction over such offense occurring in Florida. (Proof at trial showed the purchase and consumption of alcohol occurred in Florida, not Alabama[).]

.    .    .

ISSUE # 17-
COUNSEL FAILED TO MOVE FOR JUDGMENT OF ACQUITTAL

.    .    .

> So where the State[] had not offered strict proof of jurisdiction over the alleged offense(s), and where the evidence at trial tended to show the alleged offense(s), if any, actually occurred in Barrineau Park, which wholly lies within the State of Florida[ counsel should have moved for judgment of acquittal] . . . .

.     .     .

ISSUE # 23-
COUNSEL FAILED TO OBJECT TO OFFICER GRIFFITH'S TESTIMONY
REGARDING JURISDICTION OVER THE ALLEGED OFFENSE(S)

> (1)    A Bald allegation[] that the alleged offense occurred on the "[] Alabama Side" of the Perdido River is not sufficient to establish the alleged offense(s) occurred in the State of Alabama. The River is not the border at that point, between Florida/Alabama, nor did Sgt. Griffith lay predicate for his claim, that it was the "Perdido River" in fact.

*Id*. at 518, 521, 522, 524, 526 & 529.

On March 29, 2000, Charest filed written notice of appeal, *id*. at R. 577-581, and, concurrent therewith, a Court of Criminal Appeals Docketing Statement in which he briefly described all issues to be raised on appeal, including his allegation that "ALABAMA HAD NO[] SUBJECT MATTER JURISDICTION (IN PERSONAM) OF ALLEGED OFFENSES AND PROSECUTED DEFENDANT ILLEGALLY[] IN ALABAMA[.]" *Id*. at R. 570.[13]

On July 6, 2001, the Alabama Supreme Court, on application for rehearing, entered the following memorandum opinion:

> The opinion of April 13, 2001, is withdrawn and the following is substituted therefor.

> After Pat Charest had petitioned this Court for certiorari review and we had granted that petition on November 16, 2000, Judge James L. Reid, Jr., Presiding Judge of the Baldwin [County] Circuit Court, entered

---

[13]     On May 25, 2000, Susan James requested leave to withdraw as counsel of record for Charest, *id*. at R. 636, and her motion was granted by the trial court on June 2, 2000, *id*. at R. 637.

an order (dated March 16, 2001) correcting the record in various respects. We have reviewed the record as corrected. We find in that record sufficient evidence to establish that the Baldwin County Circuit Court had jurisdiction over the criminal charge against the defendant Pat Charest.

The Court of Criminal Appeals, on July 24, 2000, with an unpublished memorandum, dismissed Charest's appeal on the basis that the circuit court had not acquired subject matter jurisdiction because Charest had not paid the requisite filing fee or filed an approved in forma pauperis petition pursuant to Goldsmith v. State, 709 So.2d 1352 (Ala. Crim. App. 1997). . . . The judgment of the Court of Criminal Appeals is reversed, and this case is remanded for that court to consider the merits of the appeal.

*Charest v. Ferrell,* CA 03-0283-CB-L, Doc. 5, Exhibit C. In a published opinion released on April 26, 2002,[14] the Alabama Court of Criminal Appeals determined that "the trial judge did not have the authority to strike the timely filed petition of February 6, 1998, and any legitimate amendments thereto; the trial judge did not have the authority to enlarge the two-year limitations period established by Rule 32.2(c); and the trial judge did not have the authority to accept the 'consolidated' petition filed on April 19, 1999, as timely." *Id*., Exhibit E, at 3 (citation omitted). The Alabama Court of Criminal Appeals delineated all claims raised by petitioner in the February 6, 1998 petition, *id*. at 4-6;[15] noted that petitioner had raised on appeal some of the very claims raised in his February 6, 1998 petition (as properly amended) but also some claims not raised in the trial court, *id.* at 6; and held that "[t]hose claims that were not timely raised in his

---

[14]     The opinion released on April 26, 2002 was substituted for an earlier memorandum opinion released by the Alabama Court of Criminal Appeals on December 21, 2001, which stated the same findings and conclusions. *Compare id.* at Exhibit E *with id*. at Exhibit D.

[15]     The appellate court noted that one identified instance of ineffective assistance of counsel was petitioner's assertion that "trial counsel failed to adequately object to and preserve the issue of whether the trial court had jurisdiction to hear the case because the incidents allegedly had occurred in Florida[.]" *Id*. at 5; *see also id*. at 6 (court noted that raised as a separate issue in the February 6, 1998 Rule 32 petition was Charest's claim that "the trial court did not have jurisdiction to render judgment or impose sentence on him.").

16

petition to the circuit court cannot now be raised on appeal[]" and "[t]hose claims that Charest raised in his petition, but did not assert on appeal, have been abandoned." *Id*. at 6 & 7. Indeed, the Court of Criminal Appeals found that most of the claims Charest asserted in his February 6, 1998 Rule 32 petition were not asserted on appeal and were, therefore, abandoned, including his claim that "the trial court did not have jurisdiction to render judgment or to impose sentence on him because the offense, if any, actually occurred in Florida, rather than in Alabama[,]" as well as his claim that trial counsel failed to object to and preserve at trial "the trial court's alleged lack of jurisdiction over the case because the incidents occurred in Florida[.]" *Id*. at 7-8 n. 3. Accordingly, the appellate court remanded the matter to the trial court to address only three arguments raised in Charest's appellate brief, none of which touched upon petitioner's jurisdictional arguments. *See id*. at 9 ("That trial counsel rendered ineffective assistance because he should have objected to Charest's being placed in double jeopardy for being indicted for sexual misconduct in addition  to rape and sodomy when the sexual-misconduct charge was based on the same conduct as the rape and sodomy charges. . . . That trial counsel rendered ineffective assistance because he should have objected to Charest's being given two consecutive life sentences for his convictions for first-degree rape and sodomy. . . . That appellate counsel rendered ineffective assistance by failing to inform him that he could have petitioned the Alabama Supreme Court for certiorari review of our affirmance of h[is] convictions and sentence[s].").

In a memorandum opinion released September 20, 2002, on return to remand, the Alabama Court of Criminal Appeals affirmed the trial court's summary denial of the aforementioned three claims of ineffective assistance of counsel identified in the appellate court's April 26, 2002 decision. *Charest v. Ferrell,* 03-0283-CB-L, Doc. 5, Exhibit

F, at 3 ("The record supports the circuit court's findings that Charest's claims either presented no material issue of fact or law (claims 1 and 2),[16] or failed to state a claim (claim 3).[17] Therefore, summary disposition was appropriate, and we affirm the judgment of the circuit court." (footnotes added)). Charest's application for rehearing was overruled without opinion on November 1, 2002, *Charest v. Ferrell,* 03-0283-CB-L, Doc. 5, Exhibit I, and his petition for writ of certiorari was denied without opinion by the Alabama Supreme Court on February 21, 2003, *Charest v. Ferrell,* 03-0283-CB-L, Doc. 5, Exhibit L.

On May 7, 2003, Charest filed a petition seeking habeas corpus relief in this Court and therein identified the following claims: "(1) the Alabama Court of Criminal Appeals erred in determining that petitioner was barred in raising the ineffective assistance of counsel claims presented in his amended Rule 32 petition; and (2) trial counsel acted ineffectively by failing to challenge the Alabama courts' standard that testimony of the victim proves forcible compulsion." *Compare Charest v. Ferrell,* 03-0283-CB-L, Doc. 14, at 8 *with* Doc. 1, at 22 (petition signed by Charest's attorney, Roger C. Appell, Esquire, on May 7, 2003).  With respect to the first claim, counsel for Charest specifically contended that the Alabama Court of Criminal Appeals improperly determined that the following claims of ineffective assistance of counsel were "novel" claims that did not relate back

---

[16]     With respect to the first identified claim, the trial court determined that Charest failed to establish any prejudice since he was not convicted of sexual misconduct and, as for the second identified claim, since petitioner's convictions were for two acts requiring different elements it was within the court's discretion to sentence him to consecutive sentences. *Id.* at 2; *see also id.* ("'No objection to the sentence would have guaranteed Petitioner a different sentence, nor was the objection required to preserve the issue for appeal.'").

[17]     With respect to the third identified claim, the trial court determined that "'Petitioner failed to provide adequate evidence to establish a likelihood of success on the petition [for writ of certiorari].'" *Id.* at 2

to petitioner's February 6, 1998 Rule 32 petition, as opposed to properly determining

that these claims were mere refinements—or more definite statements—of the

ineffective assistance of trial and appellate claims raised in the February 6, 1998 Rule 32

petition:

> 1.      That trial counsel rendered ineffective assistance for failing
> to move for a judgment of acquittal.

> .      .      .

> 3.      That trial counsel rendered ineffective assistance for failing
> to request jury charges as to lesser included offenses of the offense
> charged.

> 4.      That trial counsel rendered ineffective assistance because he
> failed to file a motion for a new trial challenging the sufficiency of
> the evidence

> 5.      That appellate counsel rendered ineffective assistance
> because he failed to argue the sufficiency of the evidence on appeal.

*Charest v. Ferrell,* 03-0283-CB-L, Doc. 1, at 7-8 (quotation marks omitted); *compare id. with*

*id.*, Doc. 5, Exhibit K, at 5 (same claims identified); *see id.*, Doc. 5, Exhibit J, at 11-12 ("The

decision of September 20, 2002, is the result of the limitations placed on the trial court

by the decision of April 26, 2002, that limited the ineffective assistance of counsel issues

the trial court could consider. The ineffective assistance of counsel claims that the

Appeals Court held in the April 26, 2002, decision, pages 6-7, n.2, to be time barred are

the primary claims on which Charest bases his prayer for relief under Rule 32. This

Court deferred review of this holding pending the Appeals Court decision following

remand. That time has now come. Certiorari under Rule 39(a)(1)(D), Ala.R.App.P.[,] is

due to be granted as to the holding that the claims listed at Exhibit A, pages 6-7, n.2, are

time barred because such holding is in conflict with prior decisions of this Court and

the Appeals Court and also with several Alabama procedural rules.").[18]

On February 14, 2005, this Court dismissed Charest's federal habeas petition, finding same time-barred pursuant to 28 U.S.C. § 2244(d)(1)(A). *Compare Charest v. Ferrell*, 03-0283-CB-L, Docs. 16 & 17 *with id*., Doc. 14. In an unpublished per curiam opinion filed on November 25, 2005, a panel of the Eleventh Circuit Court of Appeals affirmed this Court's dismissal of Charest's federal habeas corpus petition; this opinion was issued as mandate on December 27, 2005. *See id*. at Doc. 25.

According to the allegations of his complaint, Charest filed his second Rule 32 petition in the Baldwin County Circuit Court on February 2, 2004, that is, before this Court's ruling on his first federal habeas corpus petition, and therein raised the following issues:  (1) defective indictment; and (2) lack of jurisdiction. (Doc. 1, at 4.) An evidentiary hearing was held on that petition over the course of two days, August 4, 2005[19] and August 10, 2005.[20] (*See* Doc. 9, Exhibit G, at 2.) As noted by the Alabama

---

[18]    Petitioner made no argument in his first federal habeas petition, or in any pleadings filed with Alabama's appellate courts, that the Alabama Court of Criminal Appeals improperly determined in its April 26, 2002 decision that he had abandoned certain claims asserted in his February 6, 1998 Rule 32 petition that he failed to assert on appeal, *see* id., same including the above-identified jurisdictional issues. *See id*.

[19]    On this date, the trial judge indicated his willingness to dismiss or set aside Charest's misdemeanor conviction, on the basis that it was void because the circuit court lacked jurisdiction. (*See* Doc. 62, Exhibit 1, August 4, 2005 Hearing Transcript, at 13.) The undersigned appreciates from the transcript of this hearing, and the transcript of the hearing held by the trial court on May 25, 2004 (*see* Doc. 62, Exhibit 1, May 25, 2004 Hearing Transcript), that the trial court did not have jurisdiction of the misdemeanor charge back in 1995 because the offending conduct occurred in 1994 prior to a statutory change and at such time misdemeanor charges could not be "brought up" to circuit court with felony charges and/or the specific misdemeanor charge of contributing to the delinquency of a minor was within the sole jurisdiction of the juvenile court and had first to be heard in that court before any *de novo* appeal in the circuit court. (*Compare id.*, August 4, 2005 Hearing, at 3-20 *with id.*, Exhibit 5, Vol. I, May 25, 2004 Hearing, at 3-43.)

Interestingly, during the August 4, 2005 hearing, though petitioner argued half-heartedly that the misdemeanor contributing to the delinquency of a minor charge prejudiced him with respect to his felony convictions (*see* Doc. 62, Exhibit 1, August 4, 2005 Tr. at 8-17), his

20

real focus was to secure some type of agreement on resentencing so he could have some hope of being released on parole (*compare id. at* 17-20 *with id.* at 5 & 9-10).

20        The following exchange occurred during the hearing on August 10, 2005:

MR. MITCHELL:        What's pending here before the Court is the Rule 32 of Mr. Charest wherein you granted his relief as to Count Three of the indictment and vacated that order of conviction and sentence.

THE COURT:  I orally did that but I don't know if we entered an order.

MR. MITCHELL:        And further relief is being agreed upon and that there is a petitioner's nunc pro tunc motion asking the Court to run the sentences that were imposed in Counts One and Two which were life sentences to run concurrently and that Mr. Charest agrees to accept that from the Court and, in return, Mr. Charest is basically closing the door on his Rule 32 petitions but for the right to reserve the issue of subject-matter jurisdiction as it applies to the location of the alleged offense as to whether it was in Alabama or whether it was in Florida.

MR. VOLLMER:        And on the record, I think it's important for Mr. Charest to indicate this was not a deal based on coercion.

THE DEFENDANT:   No, sir. . . . Never would I imply that. . . . I think you've been more than reasonable and fair with me.

.        .        .

THE COURT: Let's do this order, . . . I'll do the wording and introductory wording but No. 1, Count Three, upon review of all the evidence that's been presented, the Court is of the opinion that the Count Three charge, that there was not jurisdiction of that count . . . [for] a [circuit] court to have heard it, that that properly lied in either district or juvenile court so there was not jurisdiction. . . . That it properly lied in juvenile court and not in circuit court and so, therefore, the conviction of Count Three . . . [c]ontributing to the delinquency of a minor is voided and that count is dismissed for this court not having subject-matter jurisdiction, that because it was a void judgment, it's the opinion of the Court that . . . jeopardy never attached and that it was within the purview of the juvenile court and this court has no jurisdiction.

.        .        .

No. 2 is that upon the agreement that the issues that were pending before this court under .61, that an agreement was reached in which the State would not oppose . . . the Defendant's sentences in Counts One and Two . . . to be modified to run concurrent as opposed to them running consecutively, and that in return, Mr. Charest agrees to waive all pending Rule 61, all pending claims for relief with exception of his issue of whether the court had subject-matter jurisdiction over the actions complained of in that Mr. Charest alleges there is an issue as to whether it actually occurred in the State of Alabama or in the State of Florida and

Court of Criminal Appeals, the record on appeal revealed that "an agreement was entered between Charest and the State in which Charest was granted relief on some claims, waived other claims, and was specifically granted the right to pursue in a later

---

he does have [the] right to pursue that claim if it's later determined . . . any charges should have been brought in Florida as opposed to Alabama, that as to that subject-matter jurisdiction issue, he retains the right to pursue that, but all other claims he is hereby withdrawing and waiving any claims including whatever . . . is [in] his writ of prohibition[.] That deals with Count Three?

THE DEFENDANT:  Yes, sir. . . .

THE COURT: And that based on the Court granting his motion dismissing Count Three, that issue becomes moot, does it not?

THE DEFENDANT: I believe that we would reserve that for the Alabama Supreme Court but I would waive the mandamus.

.      .      .

THE COURT: I want you to hear what I'm saying. As far as Counts One and Two, you have been convicted of that. I take the position you committed those crimes.

THE DEFENDANT:  Okay.

THE COURT: I want a finality to everything about your case with exception of whether you should face those charges in Florida or whether you properly faced them and have been convicted in Alabama. All other issues, I understand, are done away with.

THE DEFENDANT:  In this court, I will not seek any appellate review. Everything on your table is dead as far as I'm concerned.

THE COURT: And so you're satisfied with Mr. Mitchell's advice to you?

THE DEFENDANT:  I wouldn't have hired him otherwise.

THE COURT: Okay. And . . . you are freely and voluntarily agreeing to this, right?

THE DEFENDANT:  I understand. Yes, sir. Yes, sir.

THE COURT: So the order will read that . . . Counts One and Two are hereby modified to run concurrent and all other issues are withdrawn or waived.

(Doc. 62, Exhibit 1, August 10, 2005 Hearing Tr., at 25-26, 29, 30-31, 31 & 32-33.)

petition his claim that Alabama lacked jurisdiction to render judgment in the case

involving the sexual assault of a 15-year-old girl 'if he can later determine that . . . any

charges should have been brought in Florida as opposed to Alabama.'" (Doc. 9, Exhibit

G, at 2 (citation omitted).) Indeed, on August 12, 2005, Circuit Judge Lang Floyd entered

the following order:

> This matter came before this Court on a Motion for Relief from Conviction and/or Sentence filed by the Defendant. After hearing argument from the Defendant and the State, the Court took the matter under submission. While under submission the Court was advised that a compromise was reached, subject to the approval of the Court. After being advised of the agreement, the Court does accept said agreement. Therefore, it is hereby ORDERED:
>
> 1.     The sentence on Count 3 is vacated and said Count is DISMISSED for lack of subject matter jurisdiction.
>
> 2.     The sentence in Count 2 is amended to run CONCURRENT with the sentence in Count 1.
>
> 3.     Defendant shall be allowed to continue to pursue his claim that Alabama did not have jurisdiction to prosecute Counts 1 & 2 in that the events made the basis of the charges occurred in the State of Florida. As to all other claims the Defendant withdraws [them] and stipulates that those claims are DISMISSED.

(*See, e.g.*, Doc. 59, Exhibit A; *compare id. with* Doc. 13, Exhibit 1, ORDER (footnote

added).) Consistent with his statement at the August 10, 2005 hearing that he would

seek no appellate review (*see* Doc. 62, August 10, 2005 Hearing Tr., at 33), petitioner did

not appeal the trial court's order dated August 12, 2005 (*see* Doc. 62, Exhibit 1). All the

record reveals that happened between the date of the trial court's August 12, 2005,

order and what Charest describes as his third Rule 32 petition filed on September 20,

2006 (Doc. 1, at 5), is that the trial court granted petitioner's request that the August 4

and 10, 2005 transcripts be "produced" (*see* Doc. 62, Exhibit 1, Supplemental Vol. II, at

65-68) and the Alabama Supreme Court struck Charest's petition for writ of mandamus

on October 20, 2005 (*id*. at 38), consistent with his evidentiary hearing concession that he

was waiving "the mandamus [petition]." (Doc. 62, Exhibit 1, August 10, 2005 Tr. at 31).[21]

Charest, however, did not raise in his third Rule 32 petition, filed September 20,

2006 (*see* Doc. 1, at 5; *compare id. with* Doc. 62, Exhibit 1, at 33 ("[Charest,] upon finding

two (2) dispositive issues filed, on September 20th[,] 2006 his Third Rule 32

petition[.]")), the identified jurisdictional issue(s) reflected in the August 12, 2005 order;

instead, he raised other alleged "jurisdictional defects[,]" namely: "1) That both counts

of his indictment were impermissibly amended when the jury was charged that

intentional conduct was an element of each offence. 2) That the injection of testimony

regarding the victim's low mental capacity created a material variance between the

indictment—that charged that the offenses were committed pursuant to forcible

compulsion—and the proof at trial, or in the alternative, was an impermissible

constructive amendment to the indictment."  (*See* Doc. 9, Exhibit F, at 1-2; *compare id.*

*with* Doc. 1, at 5 (identifying as the claims raised in this petition, the following: "1)

Amendment of Indictment; 2) Constructive Amendment And Fatal Variance").)[22] In an

unpublished memorandum opinion released on August 22, 2008, the Alabama Court of

---

[21]     On August 30, 2005, Thayer C. Lindauer, Esquire, penned a letter to Daniel P. Mitchell, Esquire—the attorney who represented Charest on August 4 & 10, 2005—same reading, in relevant part, as follows: "When Greg [Spies] completes his work and we have had a preliminary review of the work prior to Greg preparing the formal written report, maps and photos etc., and presuming that the results of the survey are favorable to Pat, Pat and I want you to represent Pat again in the proceedings in connection with presentation of the survey and in determining specifically the best course and options available to Pat depending upon the survey results." (Doc. 62, Exhibit 1, Supplemental Vol. II, at 52.)

[22]     Charest amended his third Rule 32 petition on January 29, 2007, to assert the following additional alleged jurisdictional impediment: "3) The United States Supreme Court's opinion in Cunningham v. California renders the trial court's imposition of sentences of life in prison illegal, because under Cunningham, it is impermissible for a trial judge to impose a sentence that is based upon facts not established beyond a reasonable doubt by a jury." (Doc. 9, Exhibit F, at 2.)

Criminal Appeals determined that because none of petitioner's claims raised in his third Rule 32 petition, as amended, were, in fact, jurisdictional claims, they were procedurally barred, time barred, and due to be denied because they were raised in a "successive petition[.]" (*See id*. at 4-6.) Thus, "the judgment of the trial court" summarily dismissing Charest's Rule 32 petition was affirmed. (*Id*. at 6; *see also id*. at 4-5.)[23]

On November 6, 2009, the Alabama Court of Criminal Appeals released its unpublished memorandum decision directed to Charest's most recent state collateral attack on his convictions and sentences, his fourth such attack on his convictions. (*See* Doc. 9, Exhibit G.) This decision reads, in relevant part, as follows:

> On October 15, 2007, Charest filed in the circuit court what he labeled as a Rule 60(b) Motion. This motion asserted that subject matter jurisdiction of his sexual assault charge lay in Florida. The circuit court treated this motion as a Rule 32 petition. The State did not file a written response. On October 2, 2008, the circuit court conducted a hearing on Charest's claim that Alabama did not have jurisdiction over the offense involving his sexual assault of a 15-year-old girl. . . . At the hearing Charest called as witnesses Gregory C. Spies, a professional-licensed surveyor to testify regarding the boundary between Alabama and Florida, and Lawrence Griffith, an investigator involved in the investigation of Charest's crimes. The State argued that, based on the evidence, the State was entitled to a judgment as a matter of law. After hearing all the evidence, the circuit court made the following oral findings on the record denying Charest's claim on the merits.
>
> > THE COURT:  Based on the evidence that's been presented to me at this point in time, taking the defendant or the petitioner's evidence completely on its own face, there has been zero testimony presented that the state of Florida claims any of that bank.
> >
> > There has been no testimony that at the time of the offense that the defendant has been convicted of that the

---

[23]    It is apparent from the complaint filed in this Court that Charest did not seek rehearing from the Alabama Court of Criminal Appeals or petition the Alabama Supreme Court for certiorari relief with respect to this third Rule 32 petition, petitioner clearly stating that the "date of result" of this collateral state petition was August 22, 2008. (Doc. 1, at 6.)

actual events occurred within the area that . . . Mr. Spies testified to even if that is where the property line would be, whether it was in that area or not. There was testimony by Sergeant Griffith that it could have been but that's speculative at best.

The burden of proof is on the defendant in this type of motion in order to establish that it did occur within that area and not some area further to the . . . west, that would have been outside the line.

All that being said, even if all of that is true, I don't find that there is evidence sufficient enough, taken completely in the light [most] favorable to the defendant, to establish this happened outside the property lines of the state of Alabama and, therefore, it would have been in Baldwin County because of this particular area.

I think the most compelling thing is that the property line, to move that much, is more than likely from a natural erosion and accretion which would allow the property line to move with the flow of the water.

I think if . . . we'd had anybody from the state of Florida testify, they would have testified from the Department of Lands [o]r Conservation or whatever, that both states have always recognized at best the edge of the water as being to Florida and, if anything, I would say that Alabama's probably accrued ownership of that property, not the state of Florida. The state of Florida can have the bridge but that's not where it occurred.

I'm gonna grant the State's motion.

A November 13, 2008[] entry on the case-action summary noted that the petition was denied on October 29, 2008. We have no explanation for the delay in entering the October 2, 200[8] ruling.

Charest appeals from the circuit court's ruling claiming, as best we can discern, that: 1) he lacked the necessary legal materials and exhibits to prove his claim; 2) he had a constitutional right to make an opening statement before the October 2, 2008[] hearing began; and 3) the circuit court's judgment was made in error and the circuit court did not comply with Rule 32.9(d) by making written findings of fact in support of its ruling.

I.

26

Charest claims that he lacked the necessary legal materials and exhibits at his hearing to prove his claim.

This claim was not raised during the October 2, 2008[] hearing.[24] On October 27, 2008, Charest filed a Motion for Reconsideration Based Upon Denial of Access to Courts By Illegal Seizure of Evidentiary Documents. In the motion[,] Charest set forth legal documents that he alleged had been seized and lost by various law enforcement officials. We note that Charest was represented by counsel at this hearing but that Charest was allowed to interject his thoughts and concerns throughout the hearing. Charest did not object regarding an alleged deprivation of evidence.

Charest's claim is the equivalent to a motion for a new trial. Because Charest did not raise this argument either before or during the hearing, his objection in the post-hearing motion was not timely and did not properly preserve this argument for our review.

II.

Charest claims that he was denied what he terms as his "constitutional right" to make an opening statement before the October 2, 2008[] hearing commenced. Before the hearing began, Charest stated that he wanted to make an opening statement. The circuit court responded:

> I don't want to hear opening statements. Let's get to the evidence. I know exactly what we're dealing with [in this] case. We're dealing with the jurisdictional issue of where [] the [] offense[s] you were convicted [of] . . . occurred, whether it occurred within the State of Alabama or whether it occurred outside the State of Alabama.

Charest did not object to the circuit court's refusal to allow opening statements. Because Charest did not challenge the circuit court's refusal to hear opening statements, he has waived the issue he now argues on appeal.

Moreover,

> The purpose of an opening statement is merely to advise a jury of the issues involved in the case before them. It is a well established rule that the scope and latitude of the

---

[24]     "Although Charest referenced this claim in his notice of appeal, that was insufficient to preserve it for appellate review." (Doc. 9, Exhibit G, at 5 n.3.)

opening statement are matters that rest within the sound discretion of the trial judge and his ruling should not be disturbed on appeal unless an abuse is shown.

Here, there was no jury and the circuit court clearly understood the claim that was the subject of the hearing. Therefore, Charest was not entitled to make an opening statement.

### III.

Charest claims that the circuit court's judgment was made in error and that the circuit court did not make the necessary <u>written</u> findings of fact to support its ruling as directed by Rule 32.9(d).

### A.

We will not reverse a trial court's ruling on a Rule 32 petition absent an abuse of discretion by the trial court. The record supports the circuit court's ruling that Charest failed to prove his claim that the alleged crime took place in Florida. Therefore, we cannot find that the circuit court abused its discretion by denying relief on Charest's claim.

Moreover, there is no merit to this claim. As best we can discern, Charest contends that the crime began in Alabama and concluded in Florida. Under the doctrine of dual sovereignty, both Alabama and Florida had jurisdiction to prosecute Charest.

> The States are no less sovereign with respect to each other than they are with respect to the Federal Government. Their powers to undertake criminal prosecutions derive from separate and independent sources of power and authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment. The States are equal to each other in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself. Thus, each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each is exercising its own sovereignty, not that of the other.

> Additionally, this is a question of personal jurisdiction. Jurisdiction over a defendant requires both personal and subject matter jurisdiction. Personal jurisdiction is attained by a defendant's appearance before the court. Subject-matter jurisdiction concerns a court's power to decide certain types of cases. Matters of personal jurisdiction are waivable and, as such, do not implicate

the subject matter jurisdiction of the trial court. Therefore, this claim would have been subject to various procedural bars had they been pleaded.

### B.

As best that we can discern, Charest's claim that the circuit court failed to enter written findings of fact is presented for the first time on appeal; therefore, it is not preserved for our review.

Moreover, Rule 32.9(d) states: The court shall make specific findings of fact relating to each material issue of fact presented. We see no prohibition against oral findings of fact. Written findings of fact are necessary only when the circuit court rules after the hearing.

Based on the above, the circuit court's denial of Charest's Rule 32 petition is affirmed.

(*Id*. at 2-8 (most internal citations and quotation marks omitted; footnote 2 omitted).)

According to Charest, his application for rehearing was overruled on December 4, 2009 and his petition for writ of certiorari was denied by the Alabama Supreme Court on January 15, 2010. *Ex parte Charest*, 76 So.3d 876 (Ala. 2010) (table).

On January 23, 2010, Charest filed an application for leave to file a second or successive habeas corpus petition pursuant to 28 U.S.C. § 2244(b) in the Eleventh Circuit Court of Appeals. (Doc. 9, Exhibit H, at 14.) Before receiving an answer from the Eleventh Circuit Court of Appeals on his application, however, Charest filed the instant habeas corpus petition in this Court on February 5, 2010 (Doc. 1, at 20 (petition signed on this date and given to prison authorities for mailing)), and therein raises the following claims: (1) "whether *vel non* [he] had a Protected First Amendment Constitutional right to redress his grievances—moreover a substantive right to have effectively accessed the courts and utilized his legal work product (i.e., "*exhibits, trial transcript excerpts, maps, charts, deeds, survey notes and other pertinent memoranda—collected*

*by private investigators*") at the October 2nd 2008 evidentiary hearing under Alabama rules of criminal procedures, Rules 32.1(b), 32.3 absent the State impediment suffered from two Baldwin County jail agents—illegal seizure/denial of evidentiary transcripts, and documents, and exhibits on September 30th 2008 as to Charest's factual and actually innocence in light of being RESENTENCED due to newly discovered evidence scientifically—exonerating Charest of guilt of any crime committed in the State of Alabama. Violation of 1[st] 5th and 14th Amendments[;]" (2) whether his constitutional right to confrontation, in accordance with the Sixth Amendment, was violated at the October 2, 2008 evidentiary hearing when Judge Langford Floyd denied petitioner ample opportunity to properly cross-examine and impeach Sergeant Griffith regarding his trial testimony in 1995;[25] and (3) whether the trial court committed reversible error by failing to make specific findings of fact and failing to enter a written order as mandated by Alabama law.[26] (Doc. 1, at 7-9.)

On February 24, 2010, a panel of the Eleventh Circuit Court of Appeals denied Charest's application for leave to file a second or successive petition. (Doc. 9, Exhibit A.)

> In his application, Charest indicates that he wishes to raise three claims in a second or successive § 2254 petition. First, he claims that he is actually innocent because "newly discovered evidence" establishes that the Alabama trial court lacked subject-matter jurisdiction over his case. Second, he asserts that his Sixth Amendment right to confront witnesses was violated at a hearing in October 2008 because he was not allowed to make an opening statement or cross-examine the state's "key witness." Finally, Charest claims that the State post-conviction court "committed reversible error" by granting judgment as a matter of law to the state in

---

[25]    The undersigned simply notes that Sergeant Lawrence Griffith was petitioner's witness at the October 2, 2008 evidentiary hearing. (Doc. 62, Exhibit 5, Vol. IV, October 2, 2008 Transcript, at 34.)

[26]    According to Charest, the evidentiary proof he offered, or attempted to offer, shows that Alabama lacked subject-matter jurisdiction in that said offenses, if any, occurred in Florida. (*Id*. at 8.)

his Ala.R.Crim.P. 32 proceedings without making required findings of fact to support[] that ruling. Charest asserts that his first two claims rely upon newly discovered evidence, but indicates as to his third claim only that it does not rely on a new rule of law. Specifically, he claims that a land survey, conducted after his conviction, proves that his alleged criminal conduct took place in Florida.

Charest's claims do not meet the statutory criteria. First, although he asserts that his first two claims rely on newly discovered evidence, the land survey does not prove that he is factually innocent of the rape and sodomy charges underlying his conviction[s] and sentence[s], and at most, relates solely to his potential legal innocence. *See* 28 U.S.C. § 2244(b)(2)(B); *see also In re Boshears*, 110 F.3d 1538, 1541 (11th Cir. 1997) (holding that the applicant must show that the newly discovered evidence established that he was actually innocent of the offense). Moreover, Charest does not assert that his third claim relies on newly discovered evidence or a new rule of law, and as such, it also fails to satisfy the statutory criteria. *See* 28 U.S.C. § 2244(b)(2)(A), (B).

Accordingly, because Charest has failed to make a *prima facie* showing of the existence of either of the grounds set forth in § 2244(b)(2), his application for leave to file a second or successive petition is hereby DENIED.

(*Id*. at 2-3.)

And while Charest argued in his habeas petition filed in this Court on February 5, 2010, that his new sentencing date of August 10, 2005 restarted AEDPA's one-year limitations period (Doc. 1, at 12), relying on the Eleventh Circuit's February 24, 2010 opinion, this Court entered its final decision, on June 8, 2010, finding Charest's petition successive and dismissing same based on petitioner's failure to comply with 28 U.S.C. § 2244(b)(3)(A) (Docs. 14-15; *see also* Doc. 10).  Charest appealed this Court's decision and, as previously alluded to, a panel of the Eleventh Circuit Court of Appeals issued an unpublished decision on April 14, 2011, vacating this Court's opinion and remanding this cause to this Court for further consideration of Charest's § 2254 petition. (Doc. 29, at

2.)[27]

Several months after this Court denied Charest's § 2244(b) application, the Supreme Court reversed this Court, in a separate case, for treating a § 2254 petition as successive when the petitioner had been resentenced prior to filing his second habeas petition. Magwood v. Patterson, ___ U.S. ___, 130 S.Ct. 2788 (2010). The Supreme Court held that where "there is a new judgment intervening between the two habeas petitions, an application challenging the resulting new judgment is not second or successive at all." Magwood, 130 S.Ct. at 2802 (quotation marks and citation omitted). The Court reasoned that "[a]lthough Congress did not define the phrase 'second or successive,' as used to modify 'habeas corpus application under section 2254,' §§ 2241(b)(1)-(2), it is well settled that the phrase does not simply 'refe[r] to all § 2254 applications filed second or successively in time.'" Id. at 2796 (quoting Panetti v. Quarterman, 551 U.S. 930, 994, 127 S.Ct. 2842, 2853 (2007) (alteration in original)). Rather, "both § 2254(b)'s text and the relief it provides indicate that the phrase 'second or successive' must be interpreted with respect to the judgment challenged." Id. at 2797.

In this case, Charest obtained certain relief with respect to the relevant sentence pursuant to an August 12, 2005, order of the Circuit Court of Baldwin County, Alabama, which order read in relevant part as follows:

> "2.  The sentence in Count 2 is amended to run
> CONCURRENT with the sentence in count 1."

See Order attached as Exh. 7 to Docket 13 ("Traverse to State's Answer to Charest's 'New Habeas Corpus' Resulting from a Re-sentencing 'Judgment.'"). The effect of this August 12, 2005, order was to provide that the two consecutive life sentences which had previously been imposed with respect to counts 1 and 2 were amended so that the two life sentences would run concurrently.

Charest argued in the court below that the August 12, 2005, order constituted a new sentence, resulting in a new judgment. Although noting the argument, the court below declined to address it . . . and proceeded to dismiss the instant habeas corpus petition for lack of jurisdiction as a second or successive petition, relying upon the February 24, 2010, order of this court rejecting Charest's application for leave to file a second or successive petition. The problem arises because, after this court's February 24, 2010, order, the Supreme Court issued its opinion in Magwood v.

---

[27]   The Eleventh Circuit's decision was issued as mandate on June 24, 2011. (Doc. 31.)

> Patterson, ___ U.S. ___, 130 S.Ct. 2788 (2010).[28] As noted above, the Court in Magwood held that where there is a new judgment intervening between the two habeas petitions, an application challenging the resulting new judgment is not second or successive at all. In this case, it is clear that Charest's initial federal habeas corpus petition challenged his original sentence, without consideration of the August 12, 2005, amendment thereto. Although Charest presented to the district court the basics of the argument to which Magwood has relevance, the district court did not address the argument.
>
> We prefer for the district court to address in the first instance the significance for this case of the Supreme Court's decision in Magwood. On remand, the district court should address, inter alia, the following issues: (1) whether the August 12, 2005, Order of the Circuit Court of Baldwin County, Alabama, constitutes a "new judgment" as contemplated by the Supreme Court in Magwood; (2) if so, whether Charest is entitled to assert in the instant habeas not only challenges to his sentence[s], but also to his underlying conviction[s]; and (3) if there is no bar to Charest's challenge to his underlying conviction[s] pursuant to 28 U.S.C. § 2244(b), is there nevertheless a bar pursuant to the abuse of the writ doctrine.[29] The second issue was expressly not addressed by the Supreme Court in Magwood. See id. at 2802-03. But see Johnson v. United States, 623 F.3d 41 (2d Cir. 2010). Also, the third issue was apparently also left open by Magwood. See Magwood, 130 S.Ct. at 2803 (Breyer, J., concurring).

(Id. at 4-7 (one footnote omitted and one footnote added).) As previously indicated, while this opinion will focus on the issues highlighted by the Eleventh Circuit panel in its decision, the undersigned will also prominently address the time-bar issue since this issue also has been completely briefed by the parties (see Docs. 50, 57 & 59).

## CONCLUSIONS OF LAW

### A.   Whether the Baldwin County Circuit Court's Order of August 12, 2005 Constitutes a New Judgment.

---

[28]      It need be noted that this Court's final order and judgment dismissing Charest's § 2254 petition for lack of jurisdiction as a second or successive petition was entered on the docket June 8, 2010 (Docs. 14-15), a little over two weeks before the decision in Magwood v. Patterson, see id. (decided June 24, 2010).

[29]      "On remand, the district court should also address any relevant time bars or procedural bars." (Doc. 29, at 7 n.3.)

In *Magwood v. Patterson,* ___ U.S. ___, 130 S.Ct. 2788, 177 L.Ed.2d 592 (2010), the Supreme Court tackled the thorny question of whether the AEDPA's restriction on "second or successive" habeas corpus applications applied to a petitioner who had already filed a § 2254 petition—as clearly has Charest—attacking his original judgment of conviction but who then files a second federal habeas application, pursuant to § 2254, attacking an intervening judgment arising as the result of resentencing. *See id.* at ___, 130 S.Ct. at 2795-2796. The Court reasoned that because a petitioner is seeking the invalidation of a state-court judgment, as specifically referenced in § 2254(b),[30] "the phrase 'second or successive' must be interpreted with respect to the judgment challenged." *Id.* at ___, 130 S.Ct. at 2797.[31] The Court concluded its analysis by adopting the rule that where "there is a new judgment intervening between the two habeas petitions, an application challenging the resulting new judgment is not second or successive at all." *Id.* at ___, 130 S.Ct. at 2802 (internal citation and quotation marks omitted); *see id.* at ___, 130 S.Ct. at 2800 ("[*Burton v. Stewart*, 549 U.S. 147, 127 S.Ct. 793, 166 L.Ed.2d 628 (2007)] confirms that the existence of a new judgment is dispositive.").

Thus, the undersigned turns to a consideration of whether the Baldwin County Circuit Court's August 12, 2005 order constitutes a new judgment. In this regard, the undersigned notes that the Eleventh Circuit has made clear, in following *Burton, supra,* that "the writ and AEDPA . . . are specifically focused on the judgment which holds the petitioner in confinement." *Ferreira v. Secretary, Dept. of Corrections*, 494 F.3d 1286, 1293

---

[30]     *See* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court . . . .").

[31]     The Supreme Court held that the phrase "second or successive" modifies the word "application" and, therefore, applies to entire habeas petitions as opposed to individual claims in those petitions/applications. *See id.* at ___, 130 S.Ct. at 2798-2799.

(11th Cir. 2007), *cert. denied sub nom. McNeil v. Ferreira*, 555 U.S. 1149, 129 S.Ct. 1033, 173 L.Ed.2d 315 (2009). "Because *Burton* reaffirmed that a 'judgment' means conviction *and* sentence, we concluded [in *Ferreira* II] that the 'judgment' to which AEDPA refers is the 'underlying conviction and []the *most recent* sentence that authorizes the petitioner's current detention.'" *Murphy v. United States*, 634 F.3d 1303, 1311 (11th Cir. 2011) (citation omitted; emphasis in original); *see also id.* ("[W]e reasoned in *Ferreira II* that: . . . a judgment is defined as both the conviction *and* the sentence," and, therefore, "when a defendant is resentenced, the defendant becomes confined under a new judgment[.]").

There can be no question but that on August 12, 2005, Charest was not only resentenced to concurrent life terms with respect to his unaltered and underlying first-degree rape and first-degree sodomy felony convictions but, as well, his underlying misdemeanor conviction and sentence were voided based upon a finding that the Circuit Court of Baldwin County, Alabama lacked jurisdiction to hear that charge back in 1995. Moreover, that order also reflects that Charest would be allowed to continue to pursue his claim that Alabama did not have jurisdiction to prosecute him for first-degree rape and first-degree sodomy in that the events made the basis of the charges occurred in the State of Florida. This last provision is, of course, merely a reflection of the requirements of Alabama post-conviction law. *Compare* Ala.R.Crim.P. 32.1(b) ("Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that . . . [t]he court was without jurisdiction to render judgment or to impose sentence.") *with* Ala.R.Crim.P. 32.2(a)(3) ("A petitioner will not be given relief under this rule based upon any ground . . . [w]hich could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b)[.]").

In light of *Magwood*'s determination that a resentencing proceeding in a death penalty case—wherein the state court again imposed the death penalty—constituted an intervening judgment, and the Eleventh Circuit's consistent determination in *Campbell v. Secretary for the Dept. of Corrections*, 447 Fed.Appx. 25, 26 & 27 (11th Cir. Oct. 13, 2011)[32] that a state trial court's reduction of a defendant's death sentence to life imprisonment constitutes an intervening judgment, the undersigned has no difficulty in determining that the August 12, 2005, Order of the Circuit Court of Baldwin County, Alabama (changing Charest's consecutive life sentences to concurrent life sentences) constitutes a "new judgment" as contemplated by the Supreme Court in *Magwood*.

**B.     In Light of the Fact that the August 12, 2005 Order of the Baldwin County Circuit Court is a New Judgment, the Court now Considers Whether Charest is Entitled to Assert Challenges Not Only With Respect to His Sentences but, as well, with Respect to his Unaltered, Underlying Convictions.**

"The State objects that our reading of § 2244(b) would allow a petitioner who obtains a conditional writ as to his sentence to file a subsequent application challenging not only his resulting, *new* sentence, but also his original, *undisturbed* conviction. The State believes this result follows because a sentence and conviction form a single 'judgment' for purposes of habeas review. This case gives us no occasion to address that question, because Magwood has not attempted to challenge his underlying conviction." *Magwood*, ___ U.S. at ___, 130 S. Ct. at 2802 (emphasis in original). In *Magwood*, petitioner only challenged his new sentence and refrained from attacking the underlying

---

[32]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

conviction. *Id.* For this reason, the Supreme Court determined that it was not at liberty to consider the policy implications of a future, speculated case that might involve a petitioner challenging his underlying conviction via a § 2254 habeas petition after a new judgment had been issued. *Id*. at 2802-2803.

Interestingly, while the majority in *Magwood* noted that "[s]everal Courts of Appeals have held that a petitioner who succeeds on a first habeas application and is resentenced may challenge only the 'portion of a judgment that arose as a result of a previous successful action[,]'" *id.* at ___, n.16, 130 S.Ct. at 2802, n. 16 (citations omitted), the Second Circuit, in considering the import of *Magwood* and other Supreme Court precedent, held that "where a first habeas petition results in an amended judgment, a subsequent petition is not successive regardless of whether it challenges the conviction, the sentence, or both." *Johnson v. United States*, 623 F.3d 41, 46 (2nd Cir. 2010); *see also Wentzell v. Neven*, 674 F.3d 1124 (9th Cir. 2012) (agreeing with Second Circuit's reasoning in *Johnson v. United States*). More importantly, in *Campbell, supra*, the Eleventh Circuit indicated that "*Magwood* permits a petitioner who received an intervening judgment to attack the prior conviction[.]" 447 Fed.Appx. at 27; *see also id*. at 27-28 ("That this view would equally apply to petitioners attacking intervening judgments under *Magwood* finds support from the only two of our sister circuits to have presently addressed this issue."); *but cf. Suggs v. United States*, 705 F.3d 279, ___, 2013 WL 173969, *4-5 & 5 (7th Cir. Jan. 17, 2013) ("*Magwood* left open the question whether a motion following a resentencing is 'second or successive' where it challenges the underlying conviction, not the resentencing. Suggs' case is distinct from the situation in *Magwood*, where the errors alleged in the second petition were '*new*.' The petitioner in *Magwood* challenged an error made in the initial sentencing and again in the

resentencing, leading the Court to observe that '[a]n error made a second time is still a new error.' The same is not true here. Suggs does not claim that any errors, new or repeated, occurred in his resentencing. Because the question before us is settled in our circuit and the Supreme Court considered the question but expressly declined to answer it, we follow our circuit's precedents and hold that Suggs' motion is second or successive. Even if the Court's reasoning in *Magwood* could extend to the facts here, we believe it would be premature to depart from our precedent where the Court has not asked us to. *Magwood's* application to these facts is not sufficiently clear for us to abandon principles of *stare decisis* based on what the Supreme Court itself called 'speculation' about how the Court would rule on an issue it expressly chose not to decide." (internal citations omitted)).

Although the undersigned believes that most of the circuit courts to have considered the import of *Magwood* have unnecessarily expanded that case even beyond the majority's analysis, this Court will follow the direction of the Eleventh Circuit. To this end, therefore, the undersigned must necessarily find under *Magwood* and *Campbell* that petitioner be allowed to present to this Court an attack on his unaltered felony convictions—on the jurisdictional ground about which Charest's federal petition makes prominent mention—without specifically seeking the Eleventh Circuit's permission to do so.

Concluding, under *Magwood* and its progeny, that the instant habeas corpus petition is not an application for which Charest was required to seek the permission of the Eleventh Circuit to file, *see* 28 U.S.C. § 2244(b), does not mean, however, that this

Court need consider the merits of Charest's jurisdictional challenge.[33]

_____

[33]     Interestingly, while petitioner admits he is challenging the trial court's jurisdiction, he contends that "his specific challenge relates to the October 2008 hearing[]" and that "[i]t is a matter of impossibility for [him] to have raised a challenge to that hearing in his earlier habeas petition[.]" (Doc. 59, at 9 & 9-10.) If petitioner's true beef, indeed, relates solely to his post-conviction proceeding held on October 2, 2008 (*compare id. with* Doc. 1 (petitioner couches his claims, as follows: (1) he was deprived of his right to redress his grievances at the October 2, 2008 evidentiary hearing based upon certain paperwork being illegally seized from him by Baldwin County jail agents; (2) at that hearing, the trial court failed to allow him to cross-examine Sergeant Griffith; and (3) the trial court failed to make specific findings of fact and enter a written order as required by Alabama law)), his present application need not detain this Court or any federal court too long inasmuch as the Eleventh Circuit "has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief." *Carroll v. Secretary, DOC*, 574 F.3d 1354, 1365 (11th Cir.), *cert. denied sub nom. Carroll v. McNeil*, ___ U.S. ___, 130 S.Ct. 500, 175 L.Ed.2d 355 (2009); *see also Alston v. Department of Corrections, State of Florida*, 610 F.3d 1318, 1325 (11th Cir. 2010) ("Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but 'an alleged defect in a collateral proceeding does not state a basis for habeas relief.'"), *cert. denied sub nom. Alston v. McNeil*, ___ U.S. ___, 131 S.Ct. 829, 178 L.Ed.2d 564 (2010); *see Staas v. McDonough*, 2007 WL 433462, *11 (M.D. Fla. Feb. 8, 2007) ("It is well established in the Eleventh Circuit that a federal court is not the appropriate forum for a prisoner who wishes to challenge the process afforded him in state collateral proceedings.").

> The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment-*i.e.*, the conviction itself-and thus habeas relief is not an appropriate remedy. Moreover, such challenges often involve claims under state law . . . which govern the availability of, and procedures attendant to, post-conviction proceedings . . . and "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."

*Carroll, supra* (citations omitted); *see also Staas, supra*, at *11 (petitioner's claim that his right to due process was violated by virtue of the state courts' failure to hold an evidentiary hearing and provide rationale for the denial of collateral relief, as well as their failure to attach portions of the record conclusively refuting the claims raised in his collateral motions and petitions, failed to state a cognizable claim under § 2254). To the extent petitioner's claims, as couched in the complaint, and as reiterated in petitioner's reply (Doc. 59, at 8-9), constitute challenges to his October 2, 2008 state collateral proceeding, those claims do not undermine the legality of petitioner's convictions themselves and, thus, provide no basis for federal habeas corpus relief. *See Holsey v. Thompson*, 462 Fed.Appx. 915, 917 (11th Cir. Mar. 21, 2012) ("We [] see no error in the district court's denial of Ground Seven, in which Holsey challenged the state habeas court's failure to address his sufficiency of the evidence claim. We have established that a challenge to a state collateral proceeding—like the one in Ground Seven—does not undermine the legality of the conviction itself and, thus, alleged defects in such proceedings do not provide a basis for habeas relief.").

More specifically, petitioner's argument regarding the trial judge's alleged failure to make specific oral findings and enter a written order is a claim arising under state law and, therefore, the state courts' interpretation of its own laws and rules in this regard "'provides no

### C.     Finding no § 2244(b) "Successive" Bar, the Court Directs its Attention to Whether there Nevertheless Exists a Bar Pursuant to the Abuse-of-the-Writ Doctrine.

Although the instant federal habeas corpus application is not a successive application for which petitioner was required to seek the permission of the Eleventh Circuit to file, there can be no question but that it represents a second-in-time federal

---

basis for federal habeas corpus relief, since no question of a constitutional nature is involved.'" *Carroll, supra,* 574 F.3d at 1365 (citation omitted). As for the Griffith issue, "the Confrontation Clause does not apply to state post-conviction proceedings[,]" *Oken v. Warden, MSP,* 233 F.3d 86, 93 (1st Cir. 2000), *cert. denied sub nom. Oken v. Merrill,* 532 U.S. 962, 121 S.Ct. 1494, 149 L.Ed.2d 380 (2001), and, therefore, this claim—Charest claiming the right to cross-examine his own witness—does not raise a cognizable habeas claim, *cf. Walls v. McDonough,* 2006 WL 3313737, *11 & 12 (M.D. Fla. Nov. 14, 2006) (petitioner's contentions that post-conviction counsel violated his due process rights to confrontation and cross-examination when she called defense counsel as her own witness, thereby denying petitioner the right to cross-examine him, did not raise issues cognizable on federal habeas corpus review). Finally, even if the transcript of the October 2, 2008 evidentiary hearing did not show, on its face, that Charest was given a full and fair opportunity to present his jurisdictional claim to the Baldwin County Circuit Court and not once brought to the trial court's attention that his legal material was confiscated by Baldwin County jail personnel, Charest's initial ground of his habeas corpus petition (cloaked in First Amendment language) is not cognizable on habeas corpus because it does not concern his detention, *Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself." (internal quotes omitted)), *cert. denied sub nom. Nichols v. Johnson,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); instead, this claim concerns Alabama's application of its own post-conviction rules and procedures, Charest specifically referencing not only the October 2, 2008 evidentiary hearing but also various Alabama Rules of Criminal Procedure. *Compare, e.g., Alston, supra,* 610 F.3d at 1326 ("[T]he state court finding that Alston was competent to waive his post-conviction proceedings concerns the state's application of its own post-conviction procedures, not the legality of Alston's detention.") *with Quince v. Crosby,* 360 F.3d 1259, 1262 (11th Cir.) (recognizing that the district court correctly found that petitioner's claim for relief based on the trial judge's refusal to recuse himself from the Rule 3.850 hearing was not a cognizable claim on habeas relief), *cert. denied,* 543 U.S. 960, 125 S.Ct. 436, 160 L.Ed.2d 325 (2004), and *Slater v. Crosby,* 2006 WL 4757825, *2 (M.D. Fla. Oct. 25, 2006) (finding failure to notify petitioner and petitioner's counsel of post-conviction hearing was not cognizable claim for relief on habeas corpus review), *aff'd,* 277 Fed.Appx. 976 (11th Cir.), *cert. denied,* 555 U.S. 871, 129 S.Ct. 170, 172 L.Ed.2d 122 (2008).

In light of the foregoing, it is patently clear to the undersigned that the only claim which could possibly entitle Charest to federal habeas corpus relief is that claim which permeates and underscores all of his non-cognizable claims, namely, that the state courts of Alabama improperly determined that his felony convictions arose from acts occurring in the State of Alabama (such that jurisdiction was proper in Alabama).

application. *Compare Campbell, supra,* 447 Fed.Appx. at 27 ("In light of the resentencing proceeding, the Court determined that, although Magwood's instant petition was second-in-time, it was his first petition 'challenging that intervening judgment.'") *with Magwood, supra,* at ___, 130 S.Ct. at 2796 ("[I]t is well settled that the phrase ['second or successive'] does not simply 'refe[r] to all § 2254 applications filed second or successively in time[.]"). Upon consideration of the principles that guide abuse-of-the-writ analysis, it is clear to the undersigned that *Magwood* and the abuse-of-the-writ doctrine can peacefully coexist in a case like the present where the record is clear that the petitioner had access to all information he needed to press the jurisdictional claim he now presses in the instant case to his unaltered felony convictions when he filed his first petition in this Court on May 7, 2003. More specifically, this Court should not view the state trial court's decision in keeping the pertinent jurisdictional issue open for further development—particularly since Alabama state trial courts must always address such claims, *compare* Ala.R.Crim.P. 32.1(b) ("Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that . . . [t]he court was without jurisdiction to render judgment or to impose sentence.") *with* Ala.R.Crim.P. 32.2(a)(3) ("A petitioner will not be given relief under this rule based upon any ground . . . [w]hich could have been but was not raised at trial, **unless** the ground for relief arises under **Rule 32.1(b)**[.]" (emphasis supplied))—as insulating Charest's present petition from abuse-of-the-writ analysis given this Court's previous recognition that jurisdictional challenges are not excluded from other AEDPA provisions. *See, e.g., Barreto-Barreto v. United States*, 551 F.3d 95, 100 (1st Cir. 2008) (pointing out that "[n]othing in the language of § 2255 suggests that jurisdictional

41

challenges are exempt from the one-year limitations period" and holding that such petitions "are not exempt from § 2255's filing deadline"); *Davis v. Secretary, Dept. of Corrections,* 2009 WL 4730548, *1 (M.D. Fla. Dec. 7, 2009) ("There is no exception under AEDPA's statute of limitation for a § 2254 claim that the state court lacked subject matter jurisdiction to impose the sentence for the conviction because the indictment was defective."); *United States v. Williams,* 2009 WL 3230399, *8 (N.D. Fla. Oct. 2, 2009) ("Jurisdiction is specifically listed as a ground for § 2255 relief, and is not excluded from [] the one year limitations period of § 2255(f)[.]"), *aff'd,* 383 Fed.Appx. 927 (11th Cir. June 21, 2010), *cert. denied,* _____U.S._____, 131 S.Ct. 846, 178 L.Ed.2d 575 (2010). More importantly, this Court should be loathe to eschew that which was first explained by the Supreme Court in *McCleskey v. Zant,* 499 U.S. 467, 489, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991), and reiterated by Justice Kennedy in dissent in *Magwood,* ___ U.S. at , 130 S.Ct. at 2804, namely, that "a petitioner can abuse the writ by raising a claim in a subsequent petition that he could have raised in his first, regardless of whether the failure to raise it earlier stemmed from a deliberate choice." The Court should be so reticent given that this "statement reaffirms every federal appellate court's repeated recognition that the term 'second or successive' is not to be taken literally but is 'informed by' the abuse-of-the-writ doctrine." *United States v. Buenrostro,* 638 F.3d 720, 724 (9th Cir.), *cert. denied,* ___ U.S. ___, 132 S.Ct. 342, 181 L.Ed.2d 215 (2011); *cf. Stewart v. United States,* 646 F.3d 856, 859 (11th Cir. 2011) ("AEDPA's restrictions on second or successive motions are meant to forestall abuse of the writ of habeas corpus, by, for instance, barring successive motions raising habeas claims that could have been raised in earlier motions where there was no legitimate excuse for failing to do so[.]" (citations omitted)); *Gilbert v. United States,* 640 F.3d 1293, 1335 (11th Cir. 2011) ("Giving life to this

limit on federal courts where state convictions are concerned, the abuse of the writ doctrine was codified in 28 U.S.C. § 2254, which governs those in custody 'pursuant to the judgment of a State Court.'"), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1001, 181 L.Ed.2d 743 (2012).

The abuse-of-the-writ doctrine was discussed at length by the Supreme Court in its post-AEDPA decision in *McCleskey v. Zant, supra*.

> Section 2244(b) raises, but does not answer, other questions. It does not state whether a district court may overlook a deliberately withheld or otherwise abusive claim to entertain the petition in any event. That is, it does not state the limits on the district court's discretion to entertain abusive petitions. Nor does the statute define the term "abuse of the writ." As was true of similar silences in the original 1948 version of § 2244, however, Congress did not intend § 2244(b) to foreclose application of the court-announced principles defining and limiting a district court's discretion to entertain abusive petitions.

.    .    .

> Like 28 U.S.C. § 2244(b), Rule 9(b) "incorporates the judge-made principle governing the abuse of the writ set forth in *Sanders*." The Advisory Committee Notes make clear that a new claim in a subsequent petition should not be entertained if the judge finds the failure to raise it earlier "inexcusable." The Notes also state that a retroactive change in the law and newly discovered evidence represent acceptable excuses for failing to raise the claim earlier.

> In recent years we have applied the abuse of the writ doctrine in various contexts. In *Woodward v. Hutchins,* 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984) (*per curiam*), the petitioner offered no explanation for asserting three claims in a second federal habeas petition not raised in the first. Five Justices inferred from the lack of explanation that the three claims "could and should have been raised in" the first petition, and that the failure to do so constituted abuse-of-the-writ. Similarly, in *Antone v. Dugger*, 465 U.S. 200, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984) (*per curiam*), we upheld the Court of Appeals' judgment that claims presented for the first time in a second federal petition constituted an abuse of the writ. We rejected petitioner's argument that he should be excused from his failure to raise the claims in [the] first federal petition because his counsel during the first federal habeas prepared the petition in haste and did not have time to become familiar with the case. And just last Term, we held that claims raised for the first time in a fourth federal habeas petition abused

the writ because they "could have been raised" or "could have been developed" in the first federal habeas petition.

.     .     .

Abuse of the writ is not confined to instances of deliberate abandonment. *Sanders* mentioned deliberate abandonment as but one example of conduct that disentitled a petitioner to relief. *Sanders* cited a passage in *Townsend v. Sain* . . . which applied the principle of inexcusable neglect, and noted that this principle also governs in the abuse-of-the-writ context.

.     .     .

[A] petitioner may abuse the writ by failing to raise a claim through inexcusable neglect. Our recent decisions confirm that a petitioner can abuse the writ by raising a claim in a subsequent petition that he could have raised in his first, regardless of whether the failure to raise it earlier stemmed from a deliberate choice.

.     .     .

For reasons we explain below, a review of our habeas corpus precedents leads us to decide that the same standard used to determine whether to excuse state procedural defaults should govern the determination of inexcusable neglect in the abuse-of-the-writ context.

.     .     .

The doctrines of procedural default and abuse of the writ implicate nearly identical concerns flowing from the significant costs of federal habeas corpus review. To begin with, the writ strikes at finality. One of the law's very objects is the finality of its judgments. Neither innocence nor just punishment can be vindicated until the final judgment is known. "Without finality, the criminal law is deprived of much of its deterrent effect."

.     .     .

Far more severe are the disruptions when a claim is presented for the first time in a second or subsequent federal habeas petition. If "[c]ollateral review of a conviction extends the ordeal of trial for both society and the accused," the ordeal worsens during subsequent collateral proceedings. Perpetual disrespect for the finality of convictions disparages the entire criminal justice system.

.     .     .

If reexamination of a conviction in the first round of federal habeas stretches resources, examination of new claims raised in a second or subsequent petition spreads them thinner still. These later petitions deplete the resources needed for federal litigants in the first instance, including litigants commencing their first federal habeas action. . . . And if reexamination of convictions in the first round of habeas offends federalism and comity, the offense increases when a State must defend its conviction in a second or subsequent habeas proceeding on grounds not even raised in the first petition.

.     .     .

We conclude from the unity of structure and purpose in the jurisprudence of state procedural defaults and abuse of the writ that the standard for excusing a failure to raise a claim at the appropriate time should be the same in both contexts. We have held that a procedural default will be excused upon a showing of cause and prejudice. We now hold that the same standard applies to determine if there has been an abuse of the writ through inexcusable neglect.

In procedural default cases, the cause standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court. Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." In addition, constitutionally "[i]neffective assistance of counsel . . . is cause." Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default. Once the petitioner has established cause, he must show "'actual prejudice' resulting from the errors of which he complains."

Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.

*Id.* at 487, 487-488, 489, 490, 490-491, 492 & 493-494, 111 S.Ct. at 1466, 1467, 1467-1468, 1468, 1469 & 1470. Consistent with *McCleskey's* statements regarding the parameters of the abuse-of-the-writ doctrine, the dissent in *Magwood* noted the following:

[I]f the petitioner had a full and fair opportunity to raise the claim in the prior application, a second-in-time application that seeks to raise the same

45

claim is barred as "second or successive." This is consistent with pre-AEDPA cases applying the abuse-of-the-writ doctrine and the bar on "second or successive" applications.

.     .     .

[U]nder abuse-of-the-writ principles, a petitioner loses his right to challenge the error by not raising a claim at the first opportunity after his claim becomes ripe. On the other hand, if the petitioner raises a claim in his second habeas petition that could not have been raised in the earlier petition—perhaps because the error occurred for the first time during resentencing—then the application raising the claim is not "second or successive" and § 2244(b)(2)'s bar does not apply.

*Magwood, supra,* ___ U.S. at ___, 130 S.Ct. at 2804 & 2806 (Kennedy, J. dissenting).

Although petitioner has attempted to artfully (but unsuccessfully) craft his claims, it is his ultimate goal to obtain this Court's consideration of the merits of his jurisdictional claim. This claim has long been known by petitioner, if not from the moment he (a citizen of Florida) was indicted by the Baldwin County Circuit Court for felonies committed in an area in close proximity to the Florida and Alabama state lines, certainly by the time petitioner was pursuing his first state-court collateral attack on his convictions and sentences in early 1998. Indeed, at least by mid-1998, Charest knew of the identity of Greg Spies, his primary (jurisdictional) witness at the October 2, 2008 evidentiary hearing, and contended in both *pro se* and counseled pleadings (as well as in counseled proceedings) that the trial court was without jurisdiction to render judgment or impose sentence in that the offenses, if any, were committed in the State of Florida, not in the State of Alabama, and that he possessed evidence showing that the alleged offenses occurred in Florida. The lengthy recitation of the factual background of the instant case reflects that Charest made numerous jurisdictional arguments while his first Rule 32 petition was pending in the Baldwin County Circuit Court and even in his March 29, 2000 *pro se* written notice of appeal. It is while this first Rule 32 was on

appeal, and again when it came before this Court on the first federal habeas attack, that Charest, through counsel, deliberately abandoned his jurisdictional claims.[34] Indeed, as previously indicated, the counseled petitioner made no argument to the Alabama Supreme Court on petition for writ of certiorari or to this Court in his first federal habeas petition that the Alabama Court of Criminal Appeals improperly determined in its April 26, 2002 decision that he had abandoned certain claims asserted in his February 6, 1998 Rule 32 petition—including his jurisdictional claims—by failing to assert them on appeal. *See, supra,* n.18.

Based on the foregoing, the undersigned finds that petitioner has lost any right to challenge the aforementioned jurisdictional error (which permeates all the "claims" asserted in this Court) by not raising that claim in his first habeas corpus attack in this Court. More specifically, the pivotal jurisdictional claim is not "new" error and was not made "new" by the fortuity of Alabama's trial court inserting into the August 12, 2005 intervening judgment its legal obligation to consider true jurisdictional claims, whenever raised. Indeed, this claim is old, dated error as it was ripe when the first federal petition was filed and should have been raised and developed during the pendency of that petition, instead of being deliberately abandoned by the counseled petitioner.[35] That Charest has abused the writ with respect to his jurisdictional claim

---

[34]     The undersigned deliberately references "claims" inasmuch as during this period of time petitioner also contended that his trial attorney provided ineffective assistance for failing to raise the jurisdictional claim prior to and during his trial.

[35]     Petitioner has no viable argument that newly discovered evidence excuses his failure to raise the claim earlier or that this Court should otherwise apply the cause and prejudice standard. Although Charest may not have been in a financial position to pay Spies for his testimony back in 1998 through 2003, he was well aware that Spies was the key to his jurisdictional claim before he filed his first federal habeas attack and, therefore, he simply cannot argue that the information Spies held was "newly discovered."

cannot be gainsaid.

**D.      Even if Charest's Jurisdictional Claim is not Abusive, the Present Habeas Corpus Petition is Nonetheless Time-Barred.**

The issue having been fully brief (*see* Docs. 50, 57 & 59), the undersigned now addresses whether this second-in-time application is time-barred pursuant to 28 U.S.C. § 2244(d).

> **(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> > **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > **(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> **(2)** The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). Applicable to the present case are subsections (d)(1)(A) and (d)(2). *Id.* Therefore, it must be determined (1) at which date the "intervening" August 12, 2005 judgment became final, and (2) the time tolled while Charest was pursuing

properly-filed post-judgment collateral petitions in the state courts of Alabama.

The Eleventh Circuit has specifically held that "AEDPA's statute of limitations runs from the date the judgment pursuant to which the petitioner is in custody becomes final, which is the date both the conviction *and* sentence the petitioner is serving become final." *Ferreira II, supra,* 494 F.3d at 1288 (emphasis in original); *see also Stites v. Secretary for the Dept. of Corrections,* 278 Fed.Appx. 933, 934 (11th Cir. May 21, 2008) ("In *Ferreira,* we concluded that 'AEDPA's statute of limitations begins to run from the date both the conviction *and* the sentence the petitioner is serving at the time he files his application become final because judgment is based on both the conviction and the sentence.'"). The pertinent "intervening" judgment in this case was entered by the Circuit Court of Baldwin County, Alabama on August 12, 2005.[36] In accordance with Rule 4 of the

---

[36]    The undersigned specifically **REJECTS** petitioner's argument that the August 12, 2005 intervening judgment did not become final until January 15, 2010 when the Alabama Supreme Court issued its certificate of judgment of final affirmance. (*See* Doc. 59, at 11.) Petitioner bases his argument on the third provision of the trial court's August 12, 2005 order which specifically recognized his "right to continue to challenge the jurisdiction of the Circuit Court of Baldwin County to adjudicate the charges against him." (*Id.*) Petitioner not only fails to cite any legal authority in support of his argument (*see id.*) but, more importantly, if accepted, his argument would effectively eviscerate the one-year limitations period set forth in the admittedly applicable § 2244(d)(1)(A) (*see id.*) and turn the core habeas concern of finality on its head. *See McCleskey, supra,* 499 U.S. at 491, 111 S.Ct. at 1468 ("[T]he writ strikes at finality. One of the law's very objects is the finality of its judgments. Neither innocence nor just punishment can be vindicated until the final judgment is known. 'Without finality, the criminal law is deprived of much of its deterrent effect.'").

Pursuant to § 2244(d)(1)(A) and relevant case law, the one-year limitations period begins to run from the date on which the judgment pursuant to which the petitioner is in custody becomes final, which is the date both the conviction *and* sentence the petitioner is serving become final, *Ferreira II, supra,* 494 F.3d at 1288 (emphasis in original), "by the conclusion of **direct review** or the expiration of the time for such review." 28 U.S.C. § 2244(d)(1)(A) (emphasis supplied). Petitioner did not appeal the August 12, 2005 order, which was his route for direct review of the intervening judgment. His later-filed Rule 60(b) motion, which was construed as a Rule 32 petition and which Charest referred in the instant federal petition as a Rule 32 petition, was a collateral, as opposed to a direct, attack on the intervening judgment. While this collateral petition could toll the running of the one-year limitations period, it cannot be regarded as part and parcel of the direct review referenced in § 2244(d)(1)(A) by the mere act of the trial court explicitly inserting in its intervening judgment that which is implicit in every judgment

Alabama Rules of Appellate Procedure, Charest had 42 days to file his notice of appeal from this new judgment. *See* Ala.R.App.P. 4(a)(1) ("Except as otherwise provided herein, in all cases in which an appeal is permitted by law as of right to the supreme court or to a court of appeals, the notice of appeal required by Rule 3 shall be filed with the clerk of the trial court within 42 days (6 weeks) of the date of the entry of the judgment or order appealed from[.]"). Charest did not appeal the trial court's August 12, 2005 order; therefore, that order became final by the conclusion of direct review, and the AEDPA's statute of limitations began running, forty-two days later on September 23, 2005. *See Hepburn v. Moore,* 215 F.3d 1208, 1209 (11th Cir. 2000) ("The statute of limitations [] began to run on October 23, 1998, the date the resentencing order became final by the conclusion of direct review.")

Charest filed a Rule 32 Petition collaterally challenging his unaltered felony convictions on September 20, 2006 (*compare* Doc. 1, at 5 *with* Doc. 62, Exhibit 1, at 33), three hundred and sixty-two (362) days after the statute of limitations began running. The Alabama Court of Criminal Appeals affirmed the trial court's denial of Charest's

rendered in Alabama, namely, that "any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that . . . [t]he court was without jurisdiction to render judgment or to impose sentence." Ala.R.Crim.P. 32.1(b). Otherwise, taken to its logical conclusion and swallowed whole, no Alabama judgment for which a jurisdictional attack could be interposed would be final until all such collateral attacks are complete. Such result would, as previously indicated, undermine the core habeas concern of finality. The undersigned declines to do such damage to the writ and, to this end, finds it clear that the August 12, 2005 judgment became final by the expiration of the time for filing direct review on September 23, 2005, *see infra,* particularly in light of the trial court's clear statement at the August 10, 2005 proceeding that it was taking the position that Charest committed (and was convicted of) the felony offenses of first-degree rape and first-degree sodomy (Doc. 62, Exhibit 1, August 10, 2005 Hearing Tr., at 32-33; *see also id.* at 33 ("I will not seek any appellate review.")), as well as petitioner's consistent position that the August 12, 2005 Order is a new judgment because it set forth a new sentence (*compare* Doc. 59, at 2-6 *with id.* at 11). Stated differently, Charest's unaltered felony convictions and concurrent life sentences became final by the expiration of the time for filing direct review on September 23, 2005. *See Hepburn, infra.*

Rule 32 petition on August 22, 2008, thereby arguably tolling the statute of limitations from September 20, 2006 until August 22, 2008.[37] The AEDPA's statute of limitations would have resumed from that point forward but for Charest having filed a Rule 60(b) motion[38] on October 15, 2007, during the pendency of the just mentioned Rule 32 petition. The life of Charest's Rule 60(b) petition, which was construed as a Rule 32 petition by the Baldwin County Circuit Court, is as follows: the petition was denied by the trial court on October 2, 2008;  the Alabama Court of Criminal Appeals affirmed the trial court's denial of the petition on November 6, 2009; Charest's application for rehearing was overruled on December 4, 2009; and  the Alabama Supreme Court denied Charest's petition for writ of certiorari on January 15, 2010. Therefore, the statute of limitations began to run again on January 16, 2010 and ran unabated until February 5, 2010 when Charest filed the instant habeas corpus attack on his felony convictions. This twenty (20) days combined with the 362 days that ran prior to the filing of his September 20, 2006 Rule 32 petition totals 382 days. Accordingly, Charest's present habeas petition is time-barred and the only avenue by which this Court can consider the merits of the petition is by finding that petitioner is entitled to equitable tolling of AEDPA's one-year limitations period.

In *Holland v. Florida*, 560 U.S. ___, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010), the Supreme Court specifically held, for the first time, that "§ 2244(d) is subject to equitable tolling in appropriate cases[,]" *id.* at ___, 130 S.Ct. at 2560, and reiterated "that a

---

[37]    The undersigned inserts the word "arguably" because this petition raised issues that the August 12, 2005 judgment did not contemplate.

[38]    This motion/petition contained the subject matter jurisdiction claim, specifically, that *if* any crimes occurred they occurred in Florida and not Alabama.

'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id*. at __, 130 S.Ct. at 2562. For its part, the Eleventh Circuit has long embraced the doctrine of equitable tolling with regard to the one-year limitations period at issue:   "Equitable tolling is to be applied when extraordinary circumstances have worked to prevent an otherwise diligent petitioner from timely filing his petition. . . . Thus, the petitioner must show both extraordinary circumstances and due diligence in order to be entitled to equitable tolling." *Diaz v. Secretary for the Dept. of Corrections*, 362 F.3d 698, 700-701 (11th Cir. 2004) (citation and internal quotation marks omitted). "Section 2244 is a statute of limitations, not a jurisdictional bar. Therefore, it permits equitable tolling 'when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence.'" *Steed v. Head,* 219 F.3d 1298, 1300 (11th Cir. 2000) (citation omitted). Thus, the one-year limitations provision need not be equitably tolled unless there is evidence that "extraordinary circumstances" beyond petitioner's control made it impossible for him to file his petition on time.  *See Miller v. New Jersey State Dept. of Corrections*, 145 F.3d 616, 618-619 (3rd Cir. 1998) ("[E]quitable tolling is proper only when the 'principles of equity would make [the] rigid application [of a limitation period] unfair.' . . . Generally, this will occur when the petitioner has 'in some extraordinary way . . . been prevented from asserting his or her rights.' . . . The petitioner must show that he or she 'exercised reasonable diligence in investigating and bringing [the] claims.' . . . Mere excusable neglect is not sufficient."). The Supreme Court in *Holland* indicated that "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence[,]" *id*. at ___, 130 S.Ct. at 2565,

and gave the following guidance with respect to "extraordinary circumstances":

> We have previously held that "a garden variety claim of excusable neglect," such as a simple "miscalculation" that leads a lawyer to miss a filing deadline, does not warrant equitable tolling. But the case before us does not involve, and we are not considering, a "garden variety claim" of attorney negligence. Rather, the facts of this case present far more serious instances of attorney misconduct. And, as we have said, although the circumstances of a case must be "extraordinary" before equitable tolling can be applied, we hold that such circumstances are not limited to those that satisfy the test that the Court of Appeals used in this case.
>
> The record facts that we have set forth in Part I of this opinion suggest that this case may well be an "extraordinary" instance in which petitioner's attorney's conduct constituted far more than "garden variety" or "excusable neglect." To be sure, Collins failed to file Holland's petition on time and appears to have been unaware of the date on which the limitations period expired-two facts that, alone, might suggest simple negligence. But, in these circumstances, the record facts we have elucidated suggest that the failure amounted to more: Here, Collins failed to file Holland's federal petition on time despite Holland's many letters that repeatedly emphasized the importance of his doing so. Collins apparently did not do the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rules. Collins failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite Holland's many pleas for that information. And Collins failed to communicate with his client over a period of years, despite various pleas from Holland that Collins respond to his letters.

*Id.* at ___, 130 S.Ct. at 2564.

In this case, Charest has not established that the instant habeas corpus petition was timely filed nor has he established that extraordinary circumstances and due diligence counsel equitable tolling of the limitations period. *See Spottsville v. Terry*, 476 F.3d 1241, 1245 (11th Cir. 2007) ("'The burden of establishing entitlement to this extraordinary remedy plainly rests with the petitioner[.]'"). Indeed, Charest actually interposes no arguments in favor of equitable tolling (*see, e.g.,* Doc. 59, at 10-11); however, the undersigned will nonetheless briefly consider possible applicability of this doctrine. In this regard, petitioner makes no argument that he was ignorant of the one-

year limitations period nor could he reasonably argue such ignorance in light of the fact that this Court found his first federal petition time-barred.[39] Moreover, the undersigned reiterates that jurisdictional challenges are not excluded from the one-year limitations period, *see, e.g., Barreto-Barreto, supra,* 551 F.3d at 100 (pointing out that "[n]othing in the language of § 2255 suggests that jurisdictional challenges are exempt from the one-year limitations period" and holding that such petitions "are not exempt from § 2255's filing deadline"); *Davis, supra,* at *1 ("There is no exception under AEDPA's statute of limitation for a § 2254 claim that the state court lacked subject matter jurisdiction to impose the sentence for the conviction because the indictment was defective."); *Williams, supra,* at *8 ("Jurisdiction is specifically listed as a ground for § 2255 relief, and is not excluded from [] the one year limitations period of § 2255(f)[.]"), and, therefore, concludes that nothing other than petitioner's own lack of due diligence is responsible for the untimeliness of the filing of the instant petition. This is simply not one of those rare cases in which principles of equitable tolling can save petitioner from AEDPA's one-year limitations period.

To the extent any of petitioner's arguments in his various pleadings can be read to suggest that the one-year limitations period is not applicable to his case because he is actually innocent of the first-degree rape and first-degree sodomy of A.C., such

---

[39]    In truth, such an argument would not serve as a basis to equitably toll the limitations period. *Gardner v. Walker,* 2005 WL 1127137, *1 (M.D. Ga. May 7, 2005) ("'Ignorance of the law is no excuse; it is not a reason for equitable tolling.' . . . Here, Petitioner's Objection is without merit because his ignorance of AEDPA's limitations period fails to amount to 'extraordinary circumstance[s]' for equitable tolling purposes."); *see also Burton v. Deloach,* 2008 WL 2131398, *2 (M.D. Ala. Mar. 13, 2008) ("The law is well settled that an inmate's lack of legal knowledge, his failure to understand legal principles and/or the inability to recognize potential claims for relief at an earlier juncture do not constitute extraordinary circumstances sufficient to warrant equitable tolling of the limitation period."), *report & recommendation adopted,* 2008 WL 2131395 (M.D. Ala. May 20, 2008); *see Teel v. Farrell,* 2006 WL 1148817, *4 (M.D. Ala. Apr. 28, 2006) ("[A]n inmate's status as a pro se litigant does not warrant equitable tolling.").

argument need be rejected. Although the Eleventh Circuit has not yet decided "whether a showing of actual innocence is an exception to the one-year statute of limitations in AEDPA[,]" *Ray v. Mitchem*, 272 Fed.Appx. 807, 810 n.2 (11th Cir.), *cert. denied*, 555 U.S. 898, 129 S.Ct. 204, 172 L.Ed.2d 170 (2008), it has guided courts to make the actual innocence inquiry as opposed to "addressing the difficult constitutional question of whether the limitations period constitutes a violation of the Suspension Clause if the petitioner can show actual innocence[.]" *Id*. To be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995); *see also id.* at 327, 115 S.Ct. at 867 ("To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."). As previously observed by the Eleventh Circuit, Charest's "newly discovered evidence," namely, the land survey, "does not prove that he is factually innocent of the rape and sodomy charges underlying his conviction[s] and sentence[s], and at most, relates solely to his potential legal innocence." (Doc. 9, Exhibit A, at 3, citing *In re Boshears,* 110 F.3d 1538, 1541 (11th Cir. 1997).) Accordingly, Charest's present federal habeas petition is time-barred. *Cf. Justo v. Culliver*, 317 Fed.Appx. 878, 881 (11th Cir. Aug. 21, 2008) ("Justo fails to show actual innocence to the offense to which he pleaded guilty. No error has been shown in the dismissal of Justo's habeas petition as time-barred.").

## **CONCLUSION**

It is recommend that the Court **DENY** Patrick Charest's federal habeas corpus

petition (Doc. 1) on the basis that he has abused the writ. In addition, the instant petition is due to be dismissed as time-barred pursuant to 28 U.S.C. § 2244(d)(1). Inasmuch as this cause is on remand from the Eleventh Circuit Court of Appeals, it is not necessary for this Court to address the issue of whether a certificate of appealability should issue.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 8th day of March, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.     *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).     The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[40] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.     *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[40]     Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).